UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
--------------------------------------------------------------X
Valley Housing LP et al.,

                               Plaintiffs,          06-cv-1319 (TLM)

City of Derby et al.,

                             Defendants
--------------------------------------------------------------X

RULING

**I.  History of the Proceeding from the date trial commenced on July 26, 2010**

     This matter was tried to the Court on July 26-29, August 10-12, September 23, 2010 and April 12-15, 18-21, 25-28, May 2, 3, and 5, with testimony concluding on May 6, 2011.  At the close of trial, the Court advised the attorneys for the parties that it would issue either an oral or written ruling as soon as practicably possible after receipt of the attorneys' post-trial filings that they had previously been ordered to file by the Court. The parties originally estimated the case would take no more than 5 days to try. (*Rec. Doc. 152*).

     Upon defendants filing a motion to recuse the undersigned on October 19, 2010 (*Rec. Doc. 212*), before ruling on the motion, the Court chose to review the transcripts of the trial to the time of the filing of defendants' motion and continued the trial without date.  The proceeding was recorded by an ECRO system and the final transcript of the initial portion of the trial was transcribed and filed via ECF on December 14, 2010 (*Rec. Doc. 221*).  The Court issued its oral reasons denying the motion on January 7, 2011

1

(*Rec. Docs. 223 and 224*).  Defendants' motion (*Rec. Doc. 212*), plaintiffs' opposition (*Rec. Doc. 213*) and the Court's ruling speak for themselves.

Trial resumed on April 12, 2011. After inquiry, the Court was informed by Chief District Judge Alvin W. Thompson that it was not an unusual practice in the District, to avoid the delay occasioned in a lengthy trial and to have the transcripts of a proceeding available to the Court and to the attorneys, for the Court to order the parties to obtain the ECRO transcripts as the trial progressed, sharing the costs.  The cost of the transcripts are then taxed as costs of the proceeding and the non-prevailing party ultimately cast with the costs of the proceeding.  On April 12, 2011, the Court entered such an order verbally (*Trial Tr., 12-14, April 12, 2011, Rec. Doc. 251*) and on May 6, 2011 the Court set a post-trial briefing schedule (*Rec. Doc. 253*).

## II. Duty of the trial Judge in a proceeding tried to the Court

In any bench trial, the trial judge, as the finder of fact, has to evaluate the credibility of the witnesses that testify, based on the witnesses' demeanor, any previous inconsistent statements made by a witness prior to and during the witness's trial testimony, the witness's explanation for any such inconsistent statements as well as the documentary evidence in the record.  The United States Supreme Court has stated that "[t]rial judges have the unique opportunity to consider the evidence in the living courtroom context, while appellate judges see only the cold paper record."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438, 116 S. Ct. 2211, 2225 (1996) (citations omitted).  The United States Court of Appeals for the Second Circuit has observed that "the full flavor of a hearing cannot be sensed from the sterile sheets of a transcript."

*ABC, Inc. v. Stewart*, 360 F.3d 90, 100 (2d Cir. 2004)(quoting *Soc'y of Prof'l Journalists v. U.S. Sec'y of Labor*, 616 F. Supp. 569, 578 (D.Utah 1985)). That is certainly the trial judge's view of the testimony given and the documents on which much of that testimony was based in this case. The record will reflect that the Court questioned each witness that testified extensively, and that all witnesses, with the exception of the parties or party representatives, were sequestered during the course of trial. The Court's findings of fact that follow are in no small part based on the trial judge's view of the credibility of the witnesses that testified, based on their trial testimony, as well as the documentary evidence and the explanation of, or reconciliation of, any previous inconsistent statements, written or oral, made by a witness.

Due to the size of the courtroom in which the trial was conducted, the trial judge was seated between three and four feet from each witness that testified as the witness testified.

### III.    Order of witnesses' testimony and the Court's view of witness credibility

The first witness to testify, on July 26, 2010, was Barbara Taylor, the Freedom of Information Act coordinator for the Connecticut Housing Finance Authority (CHFA). The Court found Taylor's testimony credible. The second witness to testify, on July 26, 2010, was Trudy Higgins, vice president of services for Birmingham Group Health Services. The Court found Higgins' testimony credible. The third witness to testify, on July 26, 2010, was Shella Runlett, director of housing counseling programs for plaintiff Home, Inc. The Court found Runlett's testimony credible. The fourth witness to testify, on July 26 and 27, 2010, was Dominick Thomas, plaintiff Home Inc.'s zoning attorney

and member of the Board of Directors for the Birmingham Group. Thomas recognized that he "can be a very pushy person" when making his point (*Thomas, Trial Tr. vol. 2, 105, July 27, 2010, Rec. Doc. 187*). The Court found Thomas's testimony credible. The fifth witness to testify, on July 27, 2010, was Richard Dunne, Derby's Economic Development Director from 1995 to 2004. The Court found Dunne's testimony credible. The sixth witness to testify, on July 28, 2010, was Linda Fusco, a Derby resident and member of the Board of Alderman in 2005. The Court found Fusco's testimony credible. The seventh witness to testify, on July 28, 2010, was David Dodes, a defense witness who was taken out of turn, who was employed by the City of Derby to write its zoning regulations in 2000 and was a paid consultant for the City of Derby at the April 21, 2005 Zoning Board of Appeals (ZBA) meeting. The Court found Dodes' testimony credible. The eighth witness to testify, on July 28 and 29, 2010, was Chris Peterson, director of real estate development for Home Inc. The Court found Peterson's testimony credible.

The ninth witness to testify, on July 29, August 10, 11 and 12, September 23, 2010, and April 12, 2011, was Samuel Rizzitelli, who was chairman of the Zoning Board of Appeals, Alderman for Ward 1 of the City of Derby and Chairman of the Democratic Town Committee, who is also an attorney. The Court found Rizzitelli's testimony riddled with inconsistencies, self-serving and not to be credible. The tenth witness to testify, on April 12, 13 and 14, 2011 was defendant David Kopjanski, Derby's Zoning Enforcement Official and Building Official. The Court found Kopjanski's testimony self-serving, inconsistent and not to be credible. The eleventh witness to testify, on April 14, 15, 18, 2011, was Joseph Migani, plaintiffs' architect. The Court found Migani's

testimony credible. The twelfth witness to testify, on April 15, 2011, was Dr. Angelo Dirienzo, a defense witness taken out of turn, who was a member of the Zoning Board of Appeals during the period in question. The Court found Dr. Dirienzo's testimony credible. The thirteenth witness to testify, on April 19, 2011, was Richard Burtula, a defense witness taken out of turn, who was defendant Derby's corporation counsel during plaintiffs' Certificate of Zoning Compliance (CZC) application process. The Court found Burtula's testimony generally credible.

The fourteenth witness to testify, on April 20, 21, 25, 26, 27 and 28, 2011 was Brett Hill, president of plaintiff HOME Inc., who is also an attorney. The Court found Hill's testimony credible and forthright, even when it was not in plaintiffs' favor, and found that Hill had an impressive mastery of the details of the plaintiffs' operations, the CHFA application and plaintiffs' damages. The fifteenth witness to testify, on May 2, 2011 was David Manley, a member of the Derby Zoning Board of Appeals. The Court found that Manley's testimony was generally credible but that he did not have a clear recollection of the proceedings in question, six years after the fact. The sixteenth witness to testify, on May 2, 3, and 5 was Marc Garofalo, former mayor of Derby. The Court found Garofalo's testimony to be riddled with inconsistencies, self-serving and not to be credible. The seventeenth witness to testify, on May 5, 2011, was Joseph Coppola, Derby's corporation counsel at the time of trial. The Court found Coppola's testimony credible.

Chris Peterson was recalled, on May 6, 2011, for the limited purpose of testifying about the additional time he had to spend on plaintiffs' project occasioned by defendants'

failure to timely provided plaintiffs with the CZCs.  The Court again found Peterson's testimony credible.  The eighteenth witness to testify, on May 6, 2011, was Richard Bartholomew, a member of the Zoning Board of Appeals during the period in question.  The Court found Bartholomew generally credible, but that he did not have a clear recollection of the proceedings in question, six years after the fact.  The nineteenth witness to testify, on May 6, 2011, was Carol Senfield, a member of the Derby Zoning Board of Appeals during the period in question.  The Court found Senfield's testimony credible.  Brett Hill was recalled, on May 6, 2011, for the limited purpose of testifying in response to defendants' motion to amend their complaint to add an affirmative defense, filed on May 2, 2011 (*Rec. Doc. 243*) and granted by the Court on May 6, 2011 (*Rec. Doc. 253*).  The Court again found Hill's testimony credible.

Sherri Pflugh, a former member of Derby's Board of Aldermen, testified by deposition dated May 17, 2007 and filed into the record as Plaintiffs' Exhibit 42. As the trial judge finds himself in the same position as would be an appellate court as it relates to the deposition testimony of Pflugh, i.e., "the full flavor of a [deposition] cannot be sensed from the sterile sheets of a transcript."  However, based on the entirety of the record before it, the Court has no reason to believe that Pflugh's deposition testimony was anything but credible.

### IV. Findings of Fact

In any trial, civil or criminal, there are two types of evidence the trier of fact may consider: direct evidence, such as testimony of an eye witness, and indirect or circumstantial evidence, the proof of circumstances that tend to prove or disprove the

existence or nonexistence of certain other facts. The law makes no distinction between direct and circumstantial evidence. In a civil case such as this one, the law simply requires that the trier of fact find the facts from a preponderance of all of the credible evidence.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). In some instances a finding of fact may also be a mixed conclusion of law and in other instances a conclusion of law may include findings of fact.

### a. Background

1. Plaintiffs' complaint in this action was filed on August 24, 2006 in the United States District Court for the District of Connecticut. (*Rec. Doc. 1*).

2. The case was originally assigned to the Honorable Robert N. Chatigny, United States District Judge. The case was transferred to the undersigned, as visiting United States District Judge, on January 21, 2010. (*Rec. Doc. 150*).

3. Plaintiff Valley Housing Limited Partnership (Valley Housing) is a Connecticut limited partnership created to develop and manage supportive housing for low-income disabled people in the Naugatuck Valley of Connecticut. (*Plaintiffs' Exhibit 3*).

4. Plaintiff Home Development Inc. is a non-profit organization, incorporated in the State of Connecticut, for the purpose of developing and maintaining affordable housing for low-income people. Home Development Inc. is a subsidiary of HOME Inc., which owns and controls it. (*Plaintiffs' Exhibit 3*).

5. Plaintiff Housing Operations Management Enterprise, Inc. (HOME Inc.) is a nonprofit developer, incorporated in the State of Connecticut, whose mission is to develop and manage safe, decent and affordable housing for low-income people. At all times relevant to this action, HOME Inc. was the developer for Valley Housing Limited Partnership and Home Development Inc. HOME Inc. was incorporated in 1988 and Brett Hill has served as its executive director since its creation and as its president since around 1998. (*Hill, Trial Tr., 37, April 20, 2011, Rec. Doc. 254*). In addition to the project that is the subject of this lawsuit, HOME Inc. has developed two other supportive housing projects in New Haven that were funded by CHFA: Cedar Hill and Whalley Terrace. (*Hill, Trial Tr., 39, 42, April 20, 2011, Rec. Doc. 254*).

6. Defendant City of Derby is a Connecticut municipality organized and existing under the laws of the State of Connecticut. Defendant David Kopjanski was, at all times relevant to this action, the Zoning Enforcement Officer for Derby authorized to issue CZCs to permit construction in Derby. At all relevant times Kopjanski had four paid positions with the City of Derby: Building Inspector, Zoning Enforcement Officer, Blight Officer and Inland Wetlands Officer. His employment by Derby was his only paid employment. *(Kopjanski, Trial Tr., 166-67, April 12, 2011, Rec. Doc. 251).*

7. Plaintiffs Valley Housing and HOME Inc. acted in a joint venture to develop three multi-family properties in Derby, Connecticut, located at 175-177 and 225-227 Caroline St., and 16 Fourth St. and two multi-family buildings in Ansonia,

Connecticut located at 24-30 State Street. Valley Housing purchased the Derby properties in February 2004. Valley Housing transferred all its assets and liabilities to Home Development, Inc. in July 2009 and Valley Housing was inactive as of the time of trial. (*Hill, Trial Tr., 16-18, April 25, 2011, Rec. Doc. 264*).

8. Plaintiffs purchased the Derby properties for the purpose of providing "supportive housing" for clients of the Birmingham Group Health Services Inc. (Birmingham Group). HOME Inc. was to be the developer and the manager for Valley Housing, and Valley Housing contracted with the Birmingham Group to be the social services provider for the intended tenants of the Derby properties. The intended tenants of the Derby properties were primarily clients of the Birmingham Group. (*Defendants' Exhibit 56*).

9. Birmingham Group, which has its primary office in Ansonia, Connecticut, was established in 1979 as the "Valley Mental Health Center." (*Higgins, Trial Tr. vol. 2,102-104, July 26, 2010, Rec. Doc. 214*). Although it has been the leading mental health agency in the Naugatuck Valley for the last 25 years, Birmingham Group has evolved over those years from solely providing mental health services to also offering services to victims of domestic violence, to persons with HIV/AIDS, and to persons with substance abuse problems. (*Higgins, Trial Tr. vol. 2, 102-104, July 26, 2010, Rec. Doc. 214*).

10. "Supportive housing" is housing which provides not only an affordable place for a tenant to live, but also provides social service support to enable people with

mental and other disabilities to live successfully in the community. All proposed tenancies in the Derby properties would be subject to ordinary Connecticut landlord-tenant law and in all respects would be operated as multi-family housing. *(Higgins, Trial Tr. vol. 2,125-128, 200-201, July 26, 2010, Rec. Doc. 214; Hill, Trial Tr., 40-41, April 20, 2011, Rec. Doc. 254).*

11. The intended tenants included persons with mental disabilities, a history of substance abuse, and/or HIV/AIDS, capable of independent living and productive community membership with Birmingham Group-provided support services. All services by Birmingham Group would be provided off-site, or through sporadic home visits, thus not interfering with the multi-family character of the housing. *(Higgins, Trial Tr. vol. 2,134-136, July 26, 2010, Rec. Doc. 214; Plaintiffs' Exhibit 4, page 10).*

12. Plaintiffs applied for funding from the State of Connecticut for this supportive housing project, and obtained a commitment from the CHFA to fund this project under the PILOTS program. (*Peterson, Trial Tr., 144-45, July 28, 2010, Rec. Doc. 189*; *Plaintiffs' Exhibit 95*). Final approval of plaintiffs' CHFA application, however, was dependent on plaintiffs being able to show that any properties purchased for supportive housing complied with all applicable zoning requirements. *(Peterson, Trial Tr., 128-131, July 28, 2010, Rec. Doc. 189; Hill, Trial Tr., 67, 71-73, April 20, 2011, Rec. Doc. 254; Migani, Trial Tr., 124, April 15, 2011, Rec. Doc. 246).*

13. It took plaintiffs and Birmingham Group over two years to locate the Derby properties. During this two year period plaintiffs, with the assistance of architect Joseph Migani, conducted an exhaustive search of regional properties. They reviewed between 40 to 50 different properties before settling on the Derby properties and the two in Ansonia that met the selection criteria of the funder, CHFA. *(Higgins, Trial Tr. vol. 2, 129-30, 137-138, July 26, 2010, Rec. Doc. 214; Migani, Trial Tr. 200-05, April 14, 2011, Rec. Doc. 245; Plaintiffs' Exhibit 60).*

14. The Derby properties were affordable by the cost-limitation standards of CHFA, and they were close to a bus route and local amenities such as grocery stores so that low-income clients could access appointments at Birmingham Group and purchase food and personal items. *(Higgins, Trial Tr. vol. 2, 129-30, 141-43, July 26, 2010, Rec. Doc. 214; Peterson, Trial Tr. vol. 1, July 29, 2010, 40-44, Rec. Doc. 188; Migani, Trial Tr., 126-133 April 15, 2011, Rec. Doc. 246).*

15. The Derby properties are located in the Central Development District zone which allows residential use. *(Plaintiffs' Exhibit 5A, page 2; Dodes, Trial Tr., 111, July 28, 2010, Rec. Doc. 189).*

16. Plaintiffs were specifically looking for properties that would not require a zoning change or variance in order to avoid a NIMBY ("not in my backyard") reaction and possible political opposition. *(Hill, Trial Tr., 95-97, 102-02, April 20, 2011, Rec. Doc. 254, Trial Tr., 105, April 28, 2011, Rec. Doc. 286; Migani, Trial Tr., 88-90, 95, April 15, 2011, Rec. Doc. 246, Trial Tr., 202-03, April 14, 2011, Rec. Doc. 245; Plaintiffs' Exhibit 1; Defendants' Exhibit 1, page 7).*

17. Plaintiffs' plan was to relocate the residents of the three Derby buildings and then renovate the interior of each building to a high standard, ending up with the same number of apartments (15), but reducing the number of bedrooms. Plaintiffs' plan was to retain the existing building envelopes, not to increase the number of units within each building or the number of persons living within each building and not to change the residential use of the buildings. (*Migani, Trial Tr., 105-07, April 15, 2011, Rec. Doc. 246*). The extensive scope of plaintiffs' renovation was required by CHFA standards as a predicate to the agency's commitment to finance the purchase of the properties as affordable rental housing for persons with low incomes. (*Migani, Trial Tr., 113-14, April 18, 2011, Rec. Doc. 255*).

18. The buildings on the Derby properties, like most of the residential units in the CDD, are nonconforming structures under Derby's zoning regulations. The Court notes that the parties originally agreed to this finding of fact, but that defendants withdrew their stipulation *(Trial Tr., 31, Sept. 23, 2010, Rec. Doc. 221);* however, the Court finds that the weight of evidence presented at trial leads the Court to conclude that the plaintiffs' properties were, in fact, nonconforming structures under Derby's zoning regulations. (*Thomas, Trial Tr. vol. 2, 48, July 27, 2010, Rec. Doc. 187; Plaintiffs' Exhibit 9; Valley Housing, LP v. Zoning Bd. of Appeals of City of Derby, 2007 WL 662729, at \*7 (Conn. Super. Ct. February 02, 2007) (Plaintiffs' Exhibit 33)).*

19. Derby zoning regulation Section 195-87(F) provides: "A nonconforming building or structure that is not devoted to a nonconforming use may be reconstructed,

structurally altered, restored or repaired in whole or in part, without the need of a variance, but must get a zoning certificate of compliance from the Zoning Officer." (*Plaintiffs' Exhibit 9, page 2*). In accordance with CHFA's funding requirements, plaintiffs were required to apply for and obtain CZCs prior to the issuance of a building permit authorizing any renovation of the Derby properties. *(Peterson, Trial Tr., 128-131, July 28, 2010, Rec. Doc. 189).*

20. Plaintiffs consulted with their architect, Migani, and expected to receive CZCs for the Derby properties as a matter of right because they intended to use the properties for residential use, as permitted in the CDD zone, and because of their legal entitlement, under both Derby zoning regulations, and state law, to renovate the buildings so long as the buildings were not enlarged. *(Peterson, Trial Tr., 125-128, July 28, 2010, Rec. Doc. 189; Hill, Trial Tr., 97-100, April 20, 2011, Rec. Doc. 254; Thomas, Trial Tr. vol. 2, 52-53, July 27, 2010, Rec. Doc. 187; Migani, Trial Tr., 89-90, 95, April 15, 2011, Rec. Doc. 246).*

### b. Mayor Marc Garofalo's Investigation of Plaintiffs' Project

21. In early 2004, the-then Mayor of Derby, Marc Garofalo, became aware of the sale of the Derby properties to plaintiffs after receiving a call from a constituent who lived in the Caroline Street neighborhood. *(Garofalo, Trial Tr., 139-40, May 2, 2011, Rec. Doc. 278).*

22. Garofalo, a Democrat, had recently been elected to his fourth two-year term as mayor. He was initially elected in 1997 and left office in 2005 after his defeat by

Anthony Staffieri, a Republican. (*Garofalo, Trial Tr., 102, May 2, 2011, Rec. Doc. 278*).

23. In an effort to determine who had purchased the properties and for what purpose, Garofalo spoke with the city assessor's office and Derby's Economic Development Director Richard Dunne, and, after learning that the new owner was "Home Inc. d/b/a Valley Housing Limited Partnership," researched HOME Inc. on the Secretary of State's website. *(Garofalo, Trial Tr., 140-44, May 2, 2011, Rec. Doc. 278, Trial Tr., 65-68, May 3, 2011, Rec. Doc. 272; Dunne, Trial Tr. vol. 3, 12-28, July 27, 2010, Rec. Doc. 215).*

24. Garofalo also called CHFA before April 23, 2004 to inquire about any pending CHFA loan applications by HOME Inc. and was told to file a Freedom of Information Act request, which he did on May 10, 2004. *(Garofalo, Trial Tr., 144-47, May 2, 2011, Rec. Doc. 278; Taylor, Trial Tr. vol. 2, 75-76 July 26, 2010, Rec. Doc. 214).*

25. On May 13, 2004, Garofalo went in person to CHFA's offices in Rocky Hill, Connecticut to review plaintiffs' application for CHFA funding for the development and renovation of the Derby properties as supportive housing. As a result of this review of plaintiffs' documents, Garofalo was aware that the Derby properties were intended for residential use by persons with disabilities and he knew the specific disabilities of the prospective tenants. *(Garofalo, Trial Tr., 145-59, May 2, 2011, Rec. Doc. 278; Taylor, Trial Tr. vol. 2, 76-82, July 26, 2010, Rec. Doc. 214; Plaintiffs' Exhibit 4).* The Court finds Garofalo's testimony that he

did not tell anyone about the information he learned from reviewing the CHFA files not only not to be credible, but incredible based on the entirety of the record of this proceeding, testimonial and documentary. *(Garofalo, Trial Tr., 149, 151-52, 158-59, May 2, 2011, Rec. Doc. 278).* As a result of his visit to CHFA, Garofalo knew that plaintiffs intended to apply for federal Low Income Housing Tax Credits as part of their PILOTS funding. *(Garofalo, Trial Tr., 75, May 3, 2011, Rec. Doc. 272; Plaintiffs' Exhibit 4, page 8).* The Court also finds Garofalo's testimony that he "didn't plan to respond in any specific way" to plaintiffs' application, through CHFA, for his approval of tax credits for plaintiffs' project not to be credible, *(Garofalo, Trial Tr., 74-80, May 3, 2011, Rec. Doc. 272)*, given his opposition to the Mutual Housing project and his success at stopping that project from going forward by blocking its tax credit funding (see Finding of Facts Paragraph 50). Richard Dunne, Derby's Economic Development Director, testified that Garofalo told him that "he was going to stop this project like he did Mutual Housing." (*Dunne, Trial Tr. vol. 3, 24, 28, July 27, 2010, Rec. Doc. 215 (agreeing that Garofalo told Dunne to give him his file, not focus on plaintiffs' project anymore and that Garofalo would take care of it)).*

26. Garofalo's position was that plaintiffs could not develop their properties as supportive housing without a process that allowed input from the City and the neighborhood and as part of a comprehensive scheme for rehabilitating the neighborhood; however, he acknowledged that such a process, once underway, could take 18 months or more and would not necessarily result in approval of

plaintiffs' project, since a similar project in another neighborhood of Derby did not get fully financed. (*Garofalo, Trial Tr., 54-56, May 5, 2011, Rec. Doc. 279*). It was Garofalo's view that "Derby should have a say in where that kind of housing gets placed." (*Garofalo, Trial Tr., 126, May 3, 2011, Rec. Doc. 272*).

### c. Kopjanski's denial of the CZC in May 2004

27. Kopjanski has been employed by Derby since 1979 (*Kopjanski, Trial Tr., 177, April 12, 2011, Rec. Doc. 251*), has served under eight different mayors and described himself as a "survivor." (*Kopjanski, Trial Tr., 186-87, April 12, 2011, Rec. Doc. 251, Trial Tr., 38, April 14, 2011, Rec. Doc. 245*). At the time of the May 25, 2004 meeting with Migani, Kopjanski was at the end of a four-year appointment as both the Building Inspector and the Zoning Enforcement Officer for the Town of Derby. Reappointment to both offices was by the Mayor, but the Zoning Enforcement Officer position also required approval by Derby's Board of Alderman. *(Kopjanski, Trial Tr., 166-77, April 12, 2011, Rec. Doc. 251).*

28. Kopjanski's employment contract with the City expired on June 30, 2004. After it expired, Kopjanski testified that he was essentially an at will employee, serving at the pleasure of Garofalo, until Garofalo re-appointed him on October 14, 2005, shortly before the election that removed Garofalo from office. *(Kopjanski, Trial Tr., 168-77, April 12, 2011, Rec. Doc. 251; Dunne, Trial Tr. vol. 3, 63, July 27, 2010, Rec. Doc. 215; Plaintiffs' Exhibit 40).*

29. Dunne and Kopjanski testified that they shared an office and used to talk about Garofalo holding their respective jobs over their heads. *(Kopjanski, Trial Tr., 181,*

*April 12, 2011, Rec. Doc. 251; Dunne, Trial Tr. vol. 3, 63-64, July 27, 2010, Rec. Doc. 215).* Kopjanski testified that Garofalo had, in fact, pushed Dunne out, although not until Dunne had a replacement job lined up. *(Kopjanski, Trial Tr., 182-83, April 12, 2011, Rec. Doc. 251).*

30. Kopjanski testified that he and Garofalo met every couple of weeks during the spring and summer of 2004 to discuss pending zoning applications, including plaintiffs' project. *(Kopjanski Trial Tr., 92, April 13, 2011, Rec. Doc. 247).* Garofalo testified that they never talked about plaintiffs' project, in direct contradiction to Kopjanski's testimony. *(Garofalo, Trial Tr., 161, May 2, 2011, Rec. Doc. 278).* Garofalo later testified that he spoke to Kopjanksi about the project when he first learned of it, contradicting himself. *(Garofalo, Trial Tr., 68-70, May 3, 2011, Rec. Doc. 272).* Garofalo also stated at the January 24, 2005 public meeting regarding the Caroline Street neighborhood that Kopjanski was "well aware of the matter–well versed in the matter I might say as well." (*Plaintiffs' Exhibit 23, page 9*).

### i. Kopjanski's knowledge of plaintiffs' proposed tenants

31. Prior to the May 25, 2004 meeting with Migani, Kopjanski admitted he had heard rumors from people in the Caroline Street neighborhood that the Derby properties were going to be used as "half-way houses" or "some kind of institutional use." *(Kopjanski, Trial Tr., 90, 116-17, April 13, 2011, Rec. Doc. 247).*

32. Also prior to the May 25, 2004 meeting, Dunne, with whom Kopjanski shared an office, asked Kopjanski whether Derby zoning regulations would allow a drug

rehabilitation treatment facility at those addresses. *(Dunne, Trial Tr. vol. 3, 7-15, July 27, 2010, Rec. Doc. 215).* Dunne and Kopjanski testified that when Dunne had found out that HOME Inc. had bought the properties, he had done internet research on HOME Inc. and had suggested the properties might be used for a drug treatment center. (*Kopjanski, Trial Tr., 58-62, April 14, 2011, Rec. Doc. 245; Dunne, Trial Tr. vol. 3, 8-10, July 27, 2010, Rec. Doc. 215*).

33. The Court credits Migani's testimony that in his May 25, 2004 meeting with Kopjanski, he told Kopjanski that HOME Inc. was his client, that they had contracted with the Birmingham Group, based on Migani's explanation that it was his standard procedure that he followed with every project, to have full disclosure in a public process. *(Migani, Trial Tr., 114-17, April 15, 2011, Rec. Doc. 246).* Migani testified that he could not recall whether he used the word "disabled," but that he believed that by mentioning Birmingham Group, Kopjanski had an understanding of who the residents of plaintiffs' properties would be and that he told Kopjanski that the property would be used for residential purposes as supportive or transitional housing for clients of the Birmingham Group. *(Migani, Trial Tr., 115-21, 120-24, April 15, 2011, Rec. Doc. 246; Trial Tr., 97-104, 109-13, April 18, 2011, Rec. Doc. 255).* At trial, Kopjanski changed his testimony that Migani had not mentioned Valley Housing or HOME Inc. at the meeting to testifying that Migani had in fact mentioned Valley Housing or HOME Inc. and supportive housing after his recollection was refreshed with his deposition testimony. *(Kopjanski, Trial Tr., 189-197, April 12, 2011, Rec. Doc. 251).*

34. Kopjanski testified that he knew there might be a social service aspect of the project, although he could not remember at trial or at his deposition whether Migani had mentioned Birmingham Group, but testified that if Migani had mentioned the Birmingham Group he would have recognized that helping people with mental disabilities is part of their duties and that it is a provider of mental health services. *(Kopjanski, Trial Tr., 201-07, April 12, 2011, Rec. Doc. 251).*

35. Although Kopjanski testified that the first meeting he had with Migani was on February 1, 2004 *(Kopjanski, Trial Tr., 198-99, April 12, 2011, Rec. Doc. 251)*, which the Court notes would have been before Valley Housing closed on the purchase of the properties *(Hill, Trial Tr., 90, April 26, 2011, Rec. Doc. 265)*, the Court credits Migani's testimony that, while he may have contacted Kopjanski earlier to set up a meeting and inquire about what paperwork was required, it was his regular practice to record any significant contacts with Kopjanski and his Ansonia counterpart in a letter to his client, HOME Inc., and the first instance of any recorded meetings was May 25, 2004. The Court credits also Migani's testimony that if he had known at an earlier date that Kopjanski was not going to issue the CZCs, he would have documented it to the client at that time. *(Migani, Trial Tr., 98-100, 112-13, April 15, 2010, Rec. Doc. 246; Hill, Trial Tr., 109-10, April 28, 2011, Rec. Doc. 286).* Migani's May 28, 2004 letter, Plaintiffs' Exhibit 2, states that the date of the meeting when Kopjanski informed Migani that he would not issue plaintiffs the CZCs was on May 25, 2004. Migani testified that he called ahead to schedule the meeting. *(Migani, Trial Tr., 102-04, April 15, 2010,*

*Rec. Doc. 246; Trial Tr.,75-79, April 18, 2011, Rec. Doc. 255).* The change in date from the first and second answers to interrogatories that plaintiffs' submitted during discovery does not affect the Court's view of either Migani or Hill's credibility. The Court finds credible Hill's explanation that plaintiffs updated their answers to the interrogatories as they developed more specific information. *(Hill, Trial Tr., 136-38, April 20, 2011, Rec. Doc. 254).* Additionally, Kopjanski changed his testimony and on cross-examination admitted that he first denied plaintiffs' request for a CZC in May 2004. *(Kopjanski, Trial Tr., 113, 118-19, April 13, 2011, Rec. Doc. 247).*

36. At their May 25 meeting, Migani told Kopjanski that the properties would be used for residential purposes, that plaintiffs would not be expanding the building envelope, and that the renovations to the interior of the building would actually decrease the bedroom count. *(Migani, Trial Tr., 105-07, April 15, 2010, Rec. Doc. 246).*

### ii. Kopjanski's stated reasons for denial of the CZCs was a pretext for discrimination

37. Kopjanski informed Migani at the May 25, 2004 meeting that he would not issue CZCs for the Derby properties and that, in order to obtain CZCs, the plaintiffs were required to apply to the ZBA for variances because the cost of the proposed renovations and improvements of the Derby properties was more than 50 percent of the replacement value of the properties under Section 195-80(c)(3) of the Derby Zoning Regulations. *(Migani, Trial Tr., 105-12, April 15, 2011, Rec. Doc. 246;*

*Plaintiffs' Exhibit 2*).   However, at trial, Kopjanski admitted that Section 195-80(c)(3) does not require a variance, but instead authorizes a variance under certain circumstances.   (*Kopjanski, Trial Tr., 223- 24, April 12, 2011, Rec. Doc. 251*, *Trial Tr., 15-35, April 13, 2011, Rec. Doc. 247* (stating the 50 percent rule does not come from 195-80(c)(3) at all, but instead permits a variance and stating "[h]indsight is 20/20.   I couldn't agree with you more.")).   Section 195-80(c) states:

> In conformity with its general power to grant variances as provided in this article, and pursuant to the guiding principles stated in this article, the Zoning Board of Appeals is hereby specifically empowered . . . (3) To grant a building permit for the reconstruction, structural alteration, restoration or repair of a structure used for a nonconforming use, to an extent exceeding in aggregate 50% of the replacement cost of such structure.

38. At trial, Kopjanski stated, for the first time, that Section 195-87(E)(1) was the section that required plaintiffs to seek a variance because demolition for the purposes of construction is damage for the purposes of that section because plaintiffs would need to destroy parts of the buildings in order to rebuild. (*Plaintiffs' Exhibit 9, page 2; Kopjanski, Trial Tr., 225-233, April 12, 2011, Rec. Doc. 251, Trial Tr., 15-33, 38-40, April 13, 2011, Rec. Doc. 247; Hill, Trial Tr., 105, April 28, 2011, Rec. Doc. 286*).   Section 195-87(E)(1) provides*:*

> Any nonforming use, if damaged or destroyed from any cause to the extent as determined by the Building Official in consultation with the City Assessor, of over 50% of the current replacement cost of such structure above the foundation shall not be rebuilt or restored for the continuance of a nonconforming use therein . . . .

The Court found Kopjanski's interpretation of Section 195-87(E)(1) that renovation is damage or destruction for purposes of that section nonsensical. Kopjanski had interpreted Section 195-87(E)(1) to apply to neglect at his meeting with Thomas in February 2005 and at his deposition, contradicting his reasoning at trial. (*Kopjanski, Trial Tr., 31-32, April 13, 2011, Rec. Doc. 247*; *Thomas, Trial Tr. vol. 2, 34-36, July 27, 2010, Rec. Doc. 187*). Kopjanski admitted he had not applied his interpretation of Section 195-87(E)(1) to other properties in the Caroline Street neighborhood that had been renovated, which, assuming they were in fact less than 50 percent replacement cost, would have needed to be sent by Kopjanski to the Planning and Zoning Commission, which Kopjanski admitted he had not done. *(Kopjanski, Trial Tr., 43-47, April 13, 2011, Rec. Doc. 247; Plaintiffs' Exhibit 9, page 2; see Findings of Fact paragraph 85).*

39. The 50 percent rule as Kopjanski interpreted it is not the rule articulated by the leading Connecticut case on the issue, *State v. Hillman*, 110 Conn. 92 (1929). The court in *Hillman* held that zoning regulations could prohibit reconstruction of a building that was devoted to a nonconforming use after it was destroyed more than 50 percent by a fire. 110 Conn. at 107. Kopjanski's interpretation was that improvement can be prohibited when there has not been damage or destruction, because to make the improvements actually occasioned destruction, thus the 50 percent rule was triggered.

40. Kopjanski also admitted at trial that in applying the portion of Section 195-20(H) that allowed density higher than 12 units per acre, which he cited to show that

plaintiffs' nonconformity could be cured if they had sufficient parking, he did not read the definition of reuse in the Derby zoning regulations when he applied Section 195-20(H) to plaintiffs' project. (*Kopjanski, Trial Tr., 50-56, April 13, 2011, Rec. Doc. 247* (stating "[t]o be honest with you, Your Honor, I didn't read this definition when I made that decision"); *Plaintiffs' Exhibit 25, page 4; Defendants' Exhibit 13, page 31*).

41. Both 195-80(C)(3) and 195-87(E) apply to properties that are non-conforming uses. Plaintiffs' properties were being renovated for continued residential use (*Findings of Fact paragraphs 8 and 10*). David Dodes, the author of Derby's 2000 zoning regulations, testified at trial that density and parking problems do not make a property a non-conforming use. (*Dodes, Trial Tr., 112, July 28, 2010, Rec. Doc. 189*).

42. The Court finds that Kopjanski's proffered reasons for the denial of the CZCs were a pretext for discrimination on the basis of disability, in conformity with Garofalo's wishes. Kopjanski's explanation was contrary to both state and local zoning law and was based on an ever-changing "interpretation" of the Derby zoning regulations.

43. During a meeting in February 2005, Thomas attempted to persuade Burtula and Kopjanski that Kopjanski's zoning interpretation and application of the 50 percent rule was contrary to state law protections of non-conformities and made no sense because it prevented plaintiffs from making major improvements to blighted properties. However, at all times during these negotiations, defendant Kopjanski

continued to refuse to issue a CZC to the plaintiffs. *(Thomas, Trial Tr. vol. 1, 41-42, July 26, 2010, Rec. Doc. 186; Buturla, Trial Tr., 37-44, April 19, 2011, Rec. Doc. 263).*

44. Notwithstanding plaintiffs' legal entitlement to CZCs, on May 25, 2004, Kopjanski denied plaintiffs' request for CZCs for the Derby properties and continued to deny CZCs through February 2005, at which point plaintiffs formally appealed such denial to the Derby ZBA. *(Thomas, Trial Tr. vol. 2, 72-78, July 27, 2010, Rec. Doc. 187; Hill, Trial Tr., 121-25, April 26, 2011, Rec. Doc. 265; Plaintiffs' Exhibits 2, 11-13)*

### d. Opposition to plaintiffs' project by city officials and in the Caroline Street neighborhood.

45. Between May 2004 and February 2005, plaintiffs negotiated with Garofalo for approval of the CZCs. *(Thomas, Trial Tr. vol. 2, 75, July 27, 2010, Rec. Doc. 187; Higgins, Trial Tr. vol. 2, 144-57, 222, July 26, 2010).*

46. In May or June of 2004, Garofalo met with Trudy Higgins, the Vice President for Operations for the Birmingham Group, and Marilyn Cormack, the Executive Director of the Birmingham Group. At that meeting, Garofalo expressed his strong opposition to the planned renovation of the Derby properties as supportive housing because Derby had long been a "dumping ground" for social service programs. He also questioned why the properties, described in the CHFA materials as "scattered site" were not scattered outside of Derby. *(Higgins, Trial*

*Tr. vol. 2, 144-57, 222, July 26, 2010, Rec. Doc. 214; Garofalo, Trial Tr., 163-64, May 2, 2011, Rec. Doc. 278; Plaintiffs' Exhibit 57).*

47. When Higgins and Cormack refused to withdraw their planned support for the Derby properties, Garofalo refused to talk to Cormack and withheld City funding for domestic violence services. *(Higgins, Trial Tr. vol. 2, 156, July 26, 2010, Rec. Doc. 214; Plaintiffs' Exhibit 57).*

48. Garofalo's view of Derby as a "dumping ground" for persons with social service needs was part of a widely-held town view that Derby already has done more than its fair share in the Naugatuck Valley for persons with social service needs, including services for persons with disabilities, and that additional programs to help persons with disabilities and other social service needs should not be located in Derby. *(Thomas, Trial Tr. vol. 1, 29-32, July 26, 2010, Rec. Doc. 186; Higgins, Trial Tr. vol. 2,144-57, July 26, 2010, Rec. Doc. 214; Peterson, Trial Tr., 170, July 28, 2010, Rec. Doc. 189; Dunne, Trial Tr. vol. 3, 54-58, July 27, 2010, Rec. Doc. 215).* Garofalo stated at his deposition that people do not always have positive views of those who need social services and "nobody wants this stuff in their backyard." *(Garofalo, Trial Tr., 116-17, May 3, 2011, Rec. Doc. 272).*

49. Consistent with this "anti-dumping" policy, in 2001 the Board of Aldermen, including Rizzitelli and supported by Garofalo, voted to end its 15-year relationship with Spooner House, a homeless shelter provider operating in the Caroline Street neighborhood because, as Garofalo put it at trial, "Derby did at least its fair share, then and now." *(Garofalo, Trial Tr., 111-22, 131-33, May 3,*

*2011, Rec. Doc. 272; Dunne, Trial Tr. vol. 3, 60-63, July 27, 2010, Rec. Doc. 215;*
*Rizzitelli, Trial Tr., 13-21, August 10, 2010, Rec. Doc. 193; Plaintiffs' Exhibit 87,*
*pages 4-7).*

50. Also consistent with this "anti-dumping policy," in 2001, Garofalo refused to support the proposal of a non-profit group, Mutual Housing of South Central Connecticut, to develop low-income housing units in the Caroline Street neighborhood. Garofalo's opposition caused the non-profit group to withdraw its application for CHFA funding because funding, in the form of federal Low Income Housing Tax Credits, was not obtainable without Garofalo's support. *(Hill, Trial Tr., 101-02, April 20, 2011, Rec. Doc. 254; Dunne, Trial Tr. vol. 3, 24-28, 30-45, July 27, 2010, Rec. Doc. 215; Garofalo, Trial Tr., 123-139, 144-45, May 2, 2011, Rec. Doc. 278; Plaintiffs' Exhibit 82).* In his letter refusing to support Mutual Housing's project, Garofalo told CHFA that Derby was planning to commence a "visioning and planning process" for the Caroline Street neighborhood *(Plaintiffs' Exhibit 82, page 3)* and testified that the public process should include the whole neighborhood; however, no plan was ever actually put in place. *(Garofalo, Trial Tr., 60-62, May 3, 2011, Rec. Doc. 272).*

51. Garofalo had the ability to secure approval of plaintiffs' project or thwart the project. *(Thomas, Trial Tr. vol. 2, 54-61, 69, July 27, 2010 Rec. Doc. 18; Peterson, Trial Tr.,168-174, July 28, 2010, Rec. Doc. 189; Hill, Trial Tr., 104, April 20, 2011, Rec. Doc. 254; Dunne, Trial Tr. vol. 3, 21, July 27, 2010, Rec. Doc. 215; Higgins, Trial Tr. vol. 2, 147-55, July 26, 2010, Rec. Doc. 214 ("[H]is*

*feeling was very clear that our project would not go forward, that it did not fit in with his vision for that area of Derby.")).*

52. At all times during the discussions, Garofalo presented himself as someone who had the authority and ability to allow the project to go forward if he chose to support it. At no time during his talks with Thomas did Garofalo direct Thomas not to talk to him about the project, or state to Thomas that the issuance of CZCs for the Derby properties was a decision to be made by Kopjanski or the ZBA. *(Thomas, Trial Tr. vol. 2, 54-61, 69, July 27, 2010, Rec. Doc. 187; Peterson, Trial Tr., 168-74, July 28, 2010, Rec. Doc. 189; Hill, Trial Tr., 104, April 20, 2011, Rec. Doc. 254).*

53. Prior to the ZBA appeal, residents of the Caroline Street neighborhood were also aware of the sale of the Derby properties to plaintiffs and knew the prospective residents of the Derby properties would include persons with substance abuse problems and persons with HIV/AIDS. *(Peterson, Trial Tr. vol. 1, 2-40, July 29, 2010, Rec. Doc. 188; Runlett, Trial Tr. vol. 2, 232-235, July 26, 2010, Rec. Doc. 214; Pflugh Deposition Testimony, Plaintiffs' Exhibit 42, deposition pages 58, 61, 64; Plaintiffs' Exhibits 23, 30, 81).*

54. The Caroline Street neighbors were vocal to Sheri Pflugh, an Alderwoman who, along with Rizzitelli, represented the Ward in which plaintiffs' Derby properties are located, about their opposition to plaintiffs' proposed use of the properties. The neighbors' opposition was based on their fears and concerns about the prospective

occupants of the Derby properties. *(Pflugh Deposition Testimony, Plaintiffs' Exhibit 42, deposition page 77, 79-83, 86-89).*

55. No Derby resident who spoke to Pflugh expressed support for plaintiffs' proposed use of the Derby properties; everyone who spoke to her expressed opposition. *(Pflugh Deposition Testimony, Plaintiffs' Exhibit 42, deposition page 86).* Constituents asked Pflugh to help them stop the project, including attending and testifying at the ZBA meeting, based on their fears and concerns about the prospective occupants of the properties. (*Pflugh Deposition Testimony, Plaintiffs' Exhibit 42, deposition page 83-87).*

56. On January 24, 2005, Garofalo addressed residents of the Caroline Street neighborhood, at which time he publicly expressed his concern about and opposition to the project. He said "there's serious concern among the neighbors," and "we're going to deal with this thing aggressively" and "the people that [Thomas] represents are in question here and that matter will- we will stand united together on that, believe me." Kopjanski, and members of the Board of Aldermen, including Rizzitelli, were present at the January 24, 2005 meeting. *(Plaintiffs' Exhibit 23).* Peterson personally requested a meeting with Garofalo to discuss the project after hearing his negative comments at the January 24, 2005 special aldermanic meeting. *(Peterson, Trial Tr., 168-69, July 28, 2010, Rec. Doc. 189).*

**e. The ZBA's decision to uphold Kopjanski's denial of the CZCs**

57. On February 28, 2005, the plaintiffs formally appealed defendant Kopjanski's denial of CZCs for the Derby properties to the ZBA. *(Plaintiffs' Exhibits 11-13).*

The ZBA discussed plaintiffs' project at four meetings: March 30, April 21, May 19 and June 16, 2005. *(Plaintiffs' Exhibits 25, 27, 28, and 29).* On April 19, 2005, while the appeal was pending, Thomas sent Kopjanski a draft of a zone text change as a method of allowing defendants to preserve their interpretation of the Derby zoning code, but making it clear that defendants' interpretation did not apply to renovations of residential properties like plaintiffs' proposed project. *(Thomas, Trial Tr. vol. 2, 21-23, 26-29, July 27, 2010, Rec. Doc. 187; Plaintiffs' Exhibit 21).* In another effort to resolve the conflict and get his clients the CZCs they needed, Thomas applied for variances to Section 195-80(c)(3) on May 20, 2005, although his view was that his clients were not required to secure them under the Derby zoning regulations and and were not entitled to the variances because they could not prove a hardship. *(Thomas, Trial Tr. vol. 2, 21-22, 26-29, July 27, 2010, Rec. Doc. 187, Plaintiffs' Exhibits 15-17).*

58. Rizzitelli, in addition to being the chairman of the Democratic Town Committee between February 2004 and June 2005, was chairman of the ZBA. *(Rizzitelli, Trial Tr., 90-97, August 10, 2010, Rec. Doc. 193).* Rizzitelli was also one of the Aldermen representing the Ward in which the Derby properties are located. *(Statement of Undisputed Facts, Rec. Doc. 129).*

59. At the time of plaintiffs' appeal, Garofalo, Alderwomen Pflugh and Fusco, as well as members of the Caroline Street neighborhood were aware of plaintiffs' intended use of the premises for supportive housing, through numerous newspaper articles, personal meetings, public meetings, as well as through Garofalo's review of

plaintiffs' CHFA application. *(Fusco, Trial Tr., 10-29, 62-66, July 28, 2010, Rec. Doc. 216; Pflugh Deposition Testimony, Plaintiffs' Exhibit 42, deposition pages 117-25, 181-82; Plaintiffs' Exhibits 4, 23, 30-32, 81).*

60. Upon learning of the filing of the ZBA appeal, Garofalo called Thomas.  He was even angrier than he had been when the two men had met.  He told Thomas once again that Derby was a dumping ground and he was going to oppose the project every step of the way.  He asked Thomas why Birmingham Group was doing this. *(Thomas, Trial Tr. vol. 2, 2-11, July 27, 2010, Rec. Doc. 187; Plaintiffs' Exhibit 19).*  Although Garofalo initially testified that he found out about plaintiffs' appeal only through the posted agenda for the ZBA's first meeting (*Garofalo, Trial Tr., 6-7, May 3, 2011, Rec. Doc. 272*), he later admitted that he found out about plaintiffs' appeal from Kopjanski within 3 days of filing the appeal, 27 days before the meeting.  He admitted that when he spoke to Thomas, he was very, very angry. (*Garofalo, Trial Tr., 99-108, May 3, 2011, Rec. Doc. 272*; *Plaintiffs' Exhibit 19*).  The Court credits Thomas' contemporaneous description of the content of the conversation in Plaintiffs' Exhibit 19.  Garofalo, after testifying in detail about what parts of Thomas's email he agreed with or disputed, admitted that at his deposition taken February 28, 2007, more than 4 years before his trial testimony, he had testified that he could not remember the conversation at all. (*Garofalo, Trial Tr., 32-34, 65-73, May 5, 2011, Rec. Doc. 279).*

61. At the time of plaintiffs' appeal, all of the members of Derby's Zoning Board of Appeals had been appointed or reappointed by Garofalo.  Rizzitelli had been

appointed to the ZBA in 1997 by Garofalo and he had been reappointed to a second 5 year term on the ZBA by Garofalo in late 2004. *(Garofalo, Trial Tr., 25-26, May 3, 2011, Rec. Doc. 272; Manley, Trial Tr., 24, 54, May 2, 2011, Rec. Doc. 278 (as an alternate); Bartholomew, Trial Tr., 51-53, May 6, 2011, Rec. Doc. 280; Senfield, Trial Tr., 88-92, May 6, 2011, Rec. Doc. 280).*

62. Rizzitelli and Garofalo spoke frequently about town matters and were political allies. *(Rizzitelli, Trial Tr., 68-74, August 10, 2010, Rec. Doc. 193; Dunne, Trial Tr. vol. 3, 48-49, 76, July 27, 2010, Rec. Doc. 215; Fusco, Trial, Tr., 34-36, July 28, 2010, Rec. Doc. 216).* Rizzitelli testified first that he had one conversation with Garofalo where Garofalo expressed his opposition to plaintiffs' project, but the conversation was "in passing" and they "never spent any deliberate amount of time on it at all." *(Rizzitelli, Trial Tr., 74-82, August 10, 2010, Rec. Doc. 193).* The following day Rizzitelli contradicted his testimony from the previous day and testified that he had "a few" conversations with Garofalo, in direct contradiction to his deposition testimony, when he remembered no conversations with Garofalo about the project. *(Rizzitelli, Trial Tr., 97-102, August 11, 2010, Rec. Doc. 194).* Garofalo testified that he never spoke to Rizzitelli about the plaintiffs' project. *(Garofalo, Trial Tr., 49, May 5, 2011, Rec. Doc. 279).*

63. Although most ZBA matters are given one public hearing, plaintiffs' appeal was given three public hearings on March 30, 2005, April 21, 2005 and June 16, 2005. Moreover, the decision to allow the public more than one opportunity to speak on plaintiffs' appeal was made before the commencement of the initial March 30

public hearing. *(Plaintiffs' Exhibit 25, page 15 (Rizzitelli stating, at the beginning of the March 30 meeting that "at the second meeting, we're going to open up with the public again . . . you will have time to obtain copies of the minutes of the meeting, understand what you're talking about and re-present at that time"); Rizzitelli, Trial Tr., 111-12, August 11, 2010, Rec. Doc. 194).*

64. At the March 20, 2005 meeting, Kopjanski presented a memo he had written to the ZBA, which was included in the minutes of the meeting, explaining his interpretation of the zoning regulations. In the memo, Kopjanski wrote that Section 195-20(H) allowed for higher densities if the property meets the parking requirements, but that plaintiffs' properties did not meet the parking requirements. Kopjanski wrote that because plaintiffs' properties failed to meet the requirements of Section 195-20(H) they were non-conforming uses. Further, he wrote that Section 195-80(c)(3) "requires a specific variance before a permit can be issued for the reconstruction, structural alteration, restoration or repair of a structure used for a non-conforming use, to an extent exceed in aggregate 50% of the replacement cost of such structure" and that based on the City Assessor's office new replacement cost estimates, plaintiffs' properties exceeded "the threshold limit of 50% of replace cost value established by Section 195-80(c)(3) of the Regulations." *(Plaintiffs' Exhibit 25, at 4-6).*

65. Although it is uncommon for public officials to get involved in ZBA matters *(Rizzitelli, Trial Tr., 113-15, August 11, 2010, Rec. Doc. 194; Kopjanski, Trial Tr., 51-58, April 14, 2011, Rec. Doc. 245),* three public officials, Garofalo,

Alderwoman Sheri Pflugh, and City Treasurer Keith Liverty, all spoke in opposition to the issuance of CZCs for the Derby properties at the March 30 public hearing. Only Sheri Pflugh lived in the Caroline Street neighborhood. *(Plaintiffs' Exhibit 25)*.

66. Although Garofalo rarely attended ZBA meetings and had never spoken in opposition to an application by a Derby property owner, he attended at least two of the four ZBA meetings on the plaintiffs' properties and spoke on March 30, 2005, asking the ZBA to uphold the denial of CZCs for the plaintiffs' properties. *(Garofalo, Trial Tr., 99, May 3, 2011, Rec. Doc. 272; Rizzitelli, Trial Tr., 113-19, August 11, 2010, Rec. Doc. 194; Plaintiffs' Exhibits 25, 27-29).* Although Garofalo asked the ZBA to "uphold the regulations," he knew little about the Derby zoning regulations. *(Garofalo, Trial Tr., 123, May 3, 2011, Rec. Doc. 272 (stating "[t]here are no density requirements in the CDD" in contradiction to Kopjanski's interpretation of the Derby zoning regulations, see Plaintiffs' Exhibit 25, page 4); Plaintiffs' Exhibit 25; Thomas, Trial Tr. vol. 2, 96, July 27, 2010 Rec. Doc. 187; Rizzitelli, Trial Tr., 113-19, August 11, 2010, Rec. Doc. 194).*

67. Alderwoman Sheri Pflugh, who had been specifically asked by residents of the Caroline Street neighborhood to attend and speak against the issuance of CZCs for the properties, had no knowledge of the underlying zoning issue and merely wanted the zoning regulations used to stop the development of the Derby properties as supportive housing for persons with disabilities, specifically persons with a history of substance abuse and persons with HIV/AIDS. *(Sherri Pflugh*

*Deposition Testimony, Plaintiffs' Exhibit 42, deposition pages 86-89, 97-108; Plaintiffs' Exhibit 25*).   In her statement before the ZBA, Alderwoman Pflugh asked the ZBA to consider who the prospective occupants of the Derby properties would be, asking the ZBA to consider "what's going to happen to the investment in our community when we move this kind of situation in . . . I don't believe that these buildings are going to be used for residential use . . . This is a business. They are going to put their clients in this building . . . We don't need that kind of thing in our neighborhood." *(Plaintiffs' Exhibit 25, page 14).*

68. The Derby residents who spoke at the March 30, 2005 public hearing similarly asked the ZBA to consider the prospective residents of the Derby properties including Ed Morales, whose testimony was specifically referenced by Rizzitelli in his written decision: "is [Thomas] going to put handicapped individuals in there?  Is it mental people? . . . [W]hat type of individual is he proposing to put in these units?" and Dan Waleski, who stated "I . . . would like to know more about who this Valley Partnership is and all their ramifications and purposes in getting into real estate what its all about . . . There is a question of safety in regard to the possible tenants that may be here." (*Plaintiffs' Exhibit 25, pages 14-16*).

69. The ZBA members were aware of plaintiffs' intended use was for supportive housing for people with disabilities, based on the statements made at the meetings they attended.  (*Plaintiffs' Exhibit 26, page 6 (Thomas stating "[i]t is referred to as supportive housing, the terminology christened by our State Representatives when they developed this program.  Because in fact the houses are improved funds*

*are allocated for improvement of the housing, funds are allocated to maintain the houses in an upgraded state, and individuals who given first preference to be in there are individuals who currently receiving some services from the Birmingham Group . . . You could have individuals who are receiving some therapy, some case management."); Dirienzo, Trial Tr., 18-19, 70-71, April 15, 2011, Rec. Doc. 246; Senfield, Trial Tr., 103-04, May 6, 2011, Rec. Doc. 280; Batholomew, Trial Tr., 82, May 6, 2011, Rec. Doc. 280 (admitting he did not recall hearing references to who plaintiffs' tenants would be in meetings when he testified that he did not know plaintiffs' tenants were disabled)).* Rizzitelli contradicted himself at trial on his knowledge of plaintiffs' intended tenants. In his trial testimony on July 29, 2010, he stated: "I had no idea" *(Rizzitelli, Trial Tr., 47, July 29, 2010, Rec. Doc. 226)*; however, on August 10, 2010, he admitted that there was "a very good possibility" that he knew that the tenants would have mental illnesses or some other handicap. *(Rizzitelli, Trial Tr., 59-50, August 10, 2010, Rec. Doc. 193)*. Rizzitelli also contradicted his deposition testimony that he had no knowledge of constituent concerns about the project *(Rizzitelli, Trial Tr., 11, July 29, 2010, Rec. Doc. 226, Trial Tr., 24-25, August 10, 2010, Rec. Doc. 193)*, with his testimony at trial that he knew his constituents were concerned, particularly "over drug addicts and drug use, and drug users and crack addicts" *(Rizzitelli, Trial Tr., 24, 27, August 10, 2010, Rec. Doc. 193)*.

70. At the April 21, 2005 ZBA meeting, the City called David Dodes, who drafted the 2000 revisions to the Derby zoning regulations, to speak as a paid consultant on

the underlying rationale behind the adoption of Section 195-80(c)(3), but Kopjanski provided no information to Dodes about plaintiffs' properties. In particular, Dodes testified that, although he met with Kopjanski before he spoke to the ZBA, he was not aware that the properties were being renovated for continued residential use at the time he addressed the ZBA and was surprised when he learned from plaintiffs' counsel shortly before trial that Kopjanski had made the determination that plaintiffs' properties were non-conforming uses. (*Dodes, Trial Tr., 107-13, July 28, 2010, Rec. Doc. 189*).

71. At the April 21, 2005 ZBA meeting, Rizzitelli refused Thomas' request that the ZBA seek a legal opinion from the Derby corporation counsel, claiming that such a request would pose a "conflict of interest" although Thomas testified at trial that corporation counsel routinely advise municipalities on zoning matters and despite Thomas's expressed willingness to waive any alleged conflict. *(Thomas, Trial Tr. vol. 2, 106-28, 138-39, July 27, 2010, Rec. Doc. 187; Rizzitelli, Trial Tr., 110-19, August 10, 2010, Rec. Doc. 193, Trial Tr., 121-24, August 11, 2010, Rec. Doc. 194, Trial Tr., 90-99, September 23, 2010, Rec. Doc. 221; Plaintiffs' Exhibit 27, pages 2-3, 10-11).* Buturla, who was then the corporation counsel for Derby, testified that the only potential conflict he perceived was that if Kopjanski had requested counsel, his firm would have had to arrange special counsel for Kopjanski, while it represented the ZBA, but that had not occurred in this instance, so there was no conflict. *(Buturla, Trial Tr., 46-47, 64-66, April 19, 2011, Rec. Doc. 263).* The Court finds that Rizzitelli's claim of a conflict was not in good

faith and Rizzitelli's goal was to maintain his control and authority over the ZBA, in order to enforce his interpretation of the zoning regulations for the purpose of denying plaintiffs' appeal.

72. At the April 21, 2005 meeting, the ZBA voted to table discussion of the appeal of Kopjanski's decision until the next meeting, but it was not discussed at the May 19, 2005 meeting, where instead plaintiffs' variance applications were discussed. *(Rizzitelli, Trial Tr., 17-44, August 12, 2010, Rec. Doc. 195; Plaintiffs' Exhibits 27 and 28).* This created confusion for several members of the ZBA, who, at the time of trial, could not distinguish between the appeal of Kopjanski's decision and the variance applications. *(Bartholomew, Trial Tr., 58, 62, 69-70, 72-73, May 6, 2011, Rec. Doc. 280; Manley, Rec. Doc. 278, Trial Tr.,42-43, 49-52, 86-91, May 2, 2011, Rec. Doc. 278 (Manley testified that the basis for his decision was Thomas's refusal to discuss the issue of parking at the meeting; however, he had voted to deny plaintiffs' appeal before that discussion took place)).*

73. Sometime in April 2005, while their appeal and variance applications were pending before the ZBA, Hill, Peterson, and Thomas met with Garofalo to try to broker a compromise. The plaintiffs went so far as to offer to see if they could still get funding for their project from CHFA if they tore down the building at 175 Caroline Street, reducing the number of units by 5 and using the land for parking, if that would satisfy the city. *(Thomas, Trial Tr. vol. 2, 57-59, July 27, 2010, Rec. Doc. 187; Peterson, Trial Tr., 168-74, July 28, 2010, Rec. Doc. 189; Hill, Trial*

*Tr., 104-09, 116, April 20, 2011, Rec. Doc. 254, Trial Tr., 87-88, April 26, 2011,*

*Rec. Doc. 265; Garofalo, Trial Tr., 159-60, May 2, 2011, Rec. Doc. 278).*

74. As he had done in previous meetings with plaintiffs' representatives, Garofalo represented himself as having power and authority to broker a compromise. Garofalo never suggested that he did not have the power to make Kopjanski or the ZBA issue CZCs to the plaintiffs. *(Thomas, Trial Tr., 57, July 27, 2010, Rec. Doc. 187; Peterson, Trial Tr., 168-74, July 28, 2010, Rec. Doc. 189).*

75. At its May 19, 2005 meeting, the ZBA refused to table the scheduled public hearing on plaintiffs' recently-filed variance requests to enable Thomas to provide notice to adjacent property owners as required by Derby's zoning regulations. Instead, in a 3 to 2 decision, the ZBA required Thomas to withdraw the requests and re-file them. *(Thomas, Trial Tr. Vol. 2, 16-17, July 27, 2010, Rec. Doc. 187; Rizzitelli, Trial Tr., 20-28, August 12, 2010, Rec. Doc. 195, Trial Tr., 253-258, September 23, 2010, Rec. Doc. 221; Plaintiffs' Exhibit 28, pages 2-9)*

76. At the June 16, 2005 ZBA meeting, the ZBA issued its unanimous decision on plaintiffs' appeals of the CZC denials with Garofalo in attendance. In an opinion, written by Rizzitelli before the meeting, and read before the ZBA vote, and attached to minutes of the meeting, the ZBA upheld Kopjanski's interpretation of Section 195-80(c)(3) as requiring the plaintiffs to seek a variance because they were a "non-conforming use" although the CDD zone allows residential use generally and there was no dispute that the properties were intended for continued residential use. *(Rizzitelli, Trial Tr., 57-63, 92-93, August 12, 2010, Rec. Doc. 195;*

*Plaintiffs' Exhibit 29, pages 2-5).* Rizzitelli testified that he had not shown the draft to any of the other four voting ZBA members before the meeting and that preparing a draft opinion was an uncommon practice. *(Rizzitelli, Trial Tr., 83, April 12, 2011, Rec. Doc. 251; Manley, Trial Tr., 72, May 2, 2011, Rec. Doc. 278 (stating he had not seen Rizzitelli's opinion before the meeting)).* Dirienzo moved for approval of the recommended decision without any discussion of the decision or explanation of its reasoning or the cases to which Rizzitelli cited. (*Plaintiffs' Exhibit 29, pages 5-6).* Rizzitelli knew that the other ZBA members deferred to him. (*Rizzitelli, Trial Tr., 153-58, September 23, 2010, Rec. Doc. 221).* Rizzitelli conflated the vote on the appeal and the vote on the variance in his trial testimony seeking to explain why there was no discussion of his decision, seeking to show that the board members knew each other's positions, even though the vote for which he drafted an opinion was the first ever direct appeal of a denial of a CZC by Kopjanski. (*Rizzitelli, Trial Tr., 153-58, September 23, 2010, Rec. Doc. 221; Kopjanski, Trial Tr., 43, April 13, 2011, Rec. Doc. 247).*

77. The Court finds that the members of the ZBA relied on Kopjanski's memo and its interpretation of the zoning regulations, (*Senfield, Trial Tr., 102-03, 108-11, May 6, 2011, Rec. Doc. 280; Dirienzo, Trial Tr. 16, 62, 72, April 15, 2011, Rec. Doc. 246)* or were not able to differentiate between their vote on the appeal and their vote on the variance. *(Bartholomew, Trial Tr., 58, 62, 69-70, 72-73, May 6, 2011, Rec. Doc. 280; Manley, Trial Tr., 42-43, 49-52, 86-91, May 2, 2011, Rec. Doc. 278).* In addition, Senfield admitted that community opposition to plaintiffs'

project was a factor in her decision. (*Senfield, Trial Tr., 104-06, May 6, 2011, Rec. Doc. 280*).

78. After concluding that plaintiffs' request for CZCs for their properties required a variance, defendants then conducted the public hearing on the variance requests and promptly issued their denial with analysis provided entirely by Rizzitelli, for lack of any hardship. *(Plaintiffs' Exhibit 29, pages 14-15)*.

79. By way of contrast, in 2002 when St. Mary's Church applied for a variance for a three-car garage that was larger than the footprint of the rectory that had been on the spot previously, the ZBA did not explicitly apply the statutory factors and easily granted a variance. *(Plaintiffs' Exhibit 110, pages 1-3)*. The Court finds that Rizzitelli's explanation for the discrepant treatment, that a prior decision by the ZBA had held that without a garage an owner could not make any reasonable use of its property and the ZBA was simply applying that decision to the church, not to be credible. *(Rizzitelli, Trial Tr., 174-207, September 23, 2010, Rec. Doc. 221)*. Rizzitelli testified that the church could not make "any reasonable use" of the property, and thus suffered a hardship, because locating the storage building away from the property line would "look stupid." (*Rizzitelli, Trial Tr., 189-190, September 23, 2010, Rec. Doc. 221*).

80. Sometime in November 2005, after he was defeated in his bid for reelection, on Garofalo's instructions, the hard drive of his and of the City's computers containing all emails, memoranda, or other records in his possession and within the possession of the City relating to plaintiffs' proposed housing project were

erased.  Although Garofalo stated at his deposition that he instructed his staff to make a hard copy of all relevant documents immediately before they were purged, he stated in an affidavit that "[i]t was obvious that we would not be able to review all the documents on our personal computers during that brief period, in order to only delete those that we were absolutely sure were of no value."  (*Plaintiffs' Exhibit 113, pages 1-2*).  Garofalo also testified that Derby did not have a document retention policy at the time the documents were deleted.  (*Plaintiffs' Exhibit 113*; *Garofalo, Trial Tr., 45-57, May 3, 2011, Rec. Doc. 272).*

**f.  Issuance of CZCs after plaintiffs' successful appeal in state court**

81. The plaintiffs appealed the ZBA's denial of their appeal and rejection of their variance requests to the Connecticut Superior Court.

82. On February 2, 2007, after plaintiffs filed this action, Judge Gerard F. Esposito, the Superior Court Judge presiding over the state court case, found in favor of plaintiffs on their appeal of Derby's denial of the CZCs.  *Valley Housing, LP v. Zoning Bd. of Appeals of City of Derby*, 2007 WL 662729 (Conn. Super. Ct. February 2, 2007) (*Plaintiffs' Exhibit 33*).  Judge Esposito held that the "ZBA's interpretation of the zoning ordinance is flawed," and that, under the "plain meaning" of the ordinance, "the subject properties are nonconforming structures, rather than nonconforming uses" thereby allowing them to be renovated without the need of a variance under the Derby zoning ordinance Section 195-87(F).  *Id.* at *15*.  Judge Esposito further stated that, under well established zoning law and Conn. Gen. Stat. § 8-2, "the City of Derby does not have the power to require an

owner of nonconforming buildings or structures to apply for variances to allow renovations of those buildings or structures." *Id.* at 19-20. Judge Esposito's decision was not appealed to the Connecticut Appellate Court.

83. On March 23, 2007, Kopjanski issued CZCs for plaintiffs' Derby properties. *(Plaintiffs Exhibits 52-54)*.

### g. Differential treatment of other properties in the CDD zone

84. Owners of two other properties in the immediate vicinity of plaintiffs' properties, located at 81-85 Minerva Street and 161-163 Caroline Street were given CZCs and building permits to substantially renovate these properties without having to seek a variance. *(Migani, Trial Tr., 133-35, April 15, 2011, Rec. Doc. 246; Peterson, Trial Tr. vol. 1, 46-73, July 29, 2010, Rec. Doc. 188)*.

85. The renovations of the two properties at 81-85 Minerva Street and 161-163 Caroline Street appeared to be gut rehabilitations; however, those planned by plaintiffs for the Derby properties may have been more extensive. *(Peterson, Trial Tr. vol. 1, 46-74, July 29, 2010, Rec. Doc. 188; Migani, Trial Tr., 133-35, April 15, 2011, Rec. Doc. 246, Trial Tr.,161-63, April 18, 2011, Rec. Doc. 255)*. Although the cost of the renovations for these two properties and whether they were more than 50 percent of the replacement cost new value was not conclusively established at trial, the Court notes that if the cost were in fact greater than 50 percent and Kopjanski had applied the same interpretation to these properties as he did to plaintiffs' properties, the owners would have needed to seek a variance from the ZBA, which they were not required to do. If in fact the cost were less than 50

percent, applying Kopjanski's revised interpretation of 195-87(E)(1) (*see Findings of Fact paragraph 38*), Kopjanski should have sent these owners to the Planning and Zoning Commission for approval. Kopjanski admitted that he had never enforced such an interpretation, on the owners of these properties or anyone else. (*Kopjanski, Trial Tr., 44-47, April 13, 2011, Rec. Doc. 247*).

### h. Plaintiffs' reasonable accommodation request

Although the Court finds that defendants intentionally discriminated against plaintiffs and therefore does not reach the question of whether defendants failed to reasonably accommodate plaintiffs, the Court makes the following findings of fact with regard to plaintiffs' reasonable accommodation request as they relate to defendants' affirmative defense of plaintiffs' failure to mitigate damages (*see Conclusions of Law Part d*).

86. On July 13, 2006, while plaintiffs' appeal to the Superior Court was pending, plaintiffs requested that the defendants grant them a reasonable accommodation pursuant to the Fair Housing Act. *(Plaintiffs' Exhibit 37; Stipulation of Counsel Rec. Doc. 169)*. The request was made by a letter addressed to Joseph Coppola, Corporation Counsel, who was, at the time of the letter, representing the City of Derby in the pending zoning appeal to Superior Court. *(Hill, Trial Tr., 117–18, 122, April 20, 2011, Rec. Doc. 254; Coppola, Trial Tr., 145, May 5, 2011, Rec. Doc. 279; Plaintiffs' Exhibit 37)*. Hill testified that plaintiffs did not request a reasonable accommodation in May 2004 because they did not believe they needed

one. *(Hill, Trial Tr., 115-16, April 26, 2011, Rec. Doc. 265, Trial Tr,. 52-53, April 27, 2011, Rec. Doc. 282).*

87. Plaintiffs received no response to their reasonable accommodation request for approximately 6 months. By letter dated January 5, 2007, Coppola responded to plaintiffs' request for a reasonable accommodation by instructing them to submit an application for a variance from the ZBA in accordance with Section 195-80(c)(3). By that time, the ZBA had already denied plaintiffs' request for a variance more than a year and a half earlier. *(Hill, Trial Tr., 123, April 20, 2011, Rec. Doc. 254; Coppola, Trial Tr., 165-67, 172-74, May 5, 2011, Rec. Doc. 279; Plaintiffs' Exhibits 38 and 39).*

88. The Court finds that plaintiffs were not required to apply for a reasonable accommodation, in May 2004 or at any later juncture, because they were entitled to CZCs for their properties under Derby zoning regulation Section 195-87(F): "A nonconforming building or structure that is not devoted to a nonconforming use may be reconstructed, structurally altered, restored or repaired in whole or in part, without the need of a variance, but must get a zoning certificate of compliance from the Zoning Officer."

## V. Conclusions of Law

### a. Intentional discrimination under the Fair Housing Act, Americans with Disabilities Act and Rehabilitation Act

1. The Fair Housing Amendments Act of 1988 extended the protections embodied in the Fair Housing Act (FHA) to persons with disabilities. Under the FHA, as

amended in 1988, it is unlawful "to discriminate in the sale or rental or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of: (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling." 42 U.S.C. § 3604(f)(1).  It is also unlawful under the FHA, as amended in 1988, "to discriminate against any person . . . in the provision of services or facilities in connection with such dwelling because of a handicap of (A) that person; or (B) a person residing in or intending to reside in that dwelling."  42 U.S.C. § 3604(f)(2).

2. Title II of the Americans with Disabilities Act[1] requires that "[n]o qualified individual with a disability, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

3. Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

---

[1] The Court notes that the ADA was amended in 2008, *see* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008); however, "[t]he Court normally must apply the laws and interpretations that were in force when the complained-of acts occurred" and other courts that have addressed this issue have concluded that amendments should not be applied retroactively. *Young v. Precision Metal Products, Inc.*, 599 F.Supp.2d 216, 223-224 (D.Conn. 2009) (collecting cases).

financial assistance . . . ." 29 U.S.C. § 794. It is undisputed that the defendant Derby is a recipient of Federal financial assistance.

4.  Connecticut state law provides that it is a discriminatory practice "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a learning disability or physical or mental disability of: (i) Such buyer or renter; (ii) a person residing in or intending to reside in such dwelling after it is so sold, rented, or made available; or (iii) any person associated with such buyer or renter." Conn. Gen. Stat. § 46a-64c(6)(A).

5.  Plaintiffs have standing to sue both as individuals and under an organizational standing theory. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 fn. 2 (2d Cir. 2002)

6.  Plaintiffs' intended tenants are predominantly people who are handicapped as defined by the Fair Housing Act, 42 U.S.C. § 3602(h) ("'Handicap' means, with respect to a person--(1) a physical or mental impairment which substantially limits one or more of such person's major life activities ... but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21)"). The intended tenants are predominantly people who are also disabled as defined by the ADA and Section 504 of the Rehabilitation Act. 42 U.S.C. § 12102(2)("The term 'disability' means, with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more major life activities of such individual. . . ."); 29 U.S.C. § 705 (same).

7. "Alcoholism, like drug addiction, is an 'impairment' under the definitions of a disability set forth in the FHA, the ADA, and the Rehabilitation Act." *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 46 (citing cases). However, "mere status as an alcoholic or substance abuser does not necessarily imply a 'limitation' under the second part of that definition." *Id.* at 47 *(citing Burch v. Coca-Cola Co., 119 F.3d 305, 316-17 (5th Cir.1997).* To qualify as handicapped or disabled, "a recovering drug addict or alcoholic 'must demonstrate [not only] that he [or she] was actually addicted to drugs or alcohol in the past, [but also] that this addiction substantially limit[s] one or more of his [or her] major life activities.'" *Id. (quoting Buckley v. Consolidated Edison Co. of New York, Inc.,* 127 F.3d 270, 274 (2d Cir.1997) (alterations in original). The Court notes that the Second Circuit has stated: "[a]n inevitable, small percentage of failures should not defeat the rights of the majority of participants in the rehabilitation program who are drug-free and therefore disabled under both statutes." *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 48 (2d Cir. 1997) *(citing* 42 U.S.C. § 12210(b)(2) and 29 U.S.C. § 706(8)(C)(ii)(II)). The Court credits plaintiffs' witness Trudy Higgins' testimony that the Birmingham Group serves persons receiving treatment for their addictions and that, while relapses occur, the Group continues to assist them on their " journey of recovery," taking small steps of progress along the way to get better. *(Trudy Higgins, Trial Tr. vol. 2, 197-99, July 26, 2010, Rec. Doc. 214).*

8. Persons with HIV/AIDS are also disabled/handicapped if their impairment limits a major life activity. *Support Ministries for Persons With AIDS, Inc. v. Village of*

*Waterford, N.Y.,* 808 F.Supp. 120, 129-33 (N.D.N.Y.1992) (finding HIV/AIDS status handicap under FHA even for those independent in all activities of daily living and collecting cases); *see also Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003).

9. Mental illness is also recognized as a handicap and disability. 28 CFR § 41.31(b)(1)(ii); 45 C.F.R. § 84.3(j)(2)(i); 24 C.F.R. § 100.201(a)(2).

10. Major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 41.31(b)(2); 45 C.F.R. § 84.3(j)(2)(ii); 24 C.F.R. § 100.201(b). Plaintiffs' project descriptions, in particular describing the prospective tenants and the kind of support services they would receive, amply demonstrate that plaintiffs' prospective tenants were limited in major life activities, including "caring for oneself" and "working". *See Reg'l Econ. Cmty. Action Program*, 294 F.3d at 47-48; *see also Plaintiffs' Exhibit 4, pages 10-13*.

11. The Court finds that most of plaintiffs' proposed tenants are protected as handicapped or disabled under the relevant statutes and that the inclusion of a few possibly non-disabled tenants, such as those in the domestic violence program, does not alter the Court's conclusion that Derby discriminated against plaintiffs based on the disabilities or handicaps of plaintiffs' prospective tenants. In addition, the Court credits testimony from the plaintiffs' witness Trudy Higgins' testimony that some victims of domestic violence could be considered disabled

because they are suffering from mental illness such as post traumatic stress disorder. *(Trudy Higgins, Trial Tr. vol. 2, 136, July 26, 2010, Rec. Doc. 214)*.

12. Kopjanski's status as a municipal employee is sufficient to create Derby's liability for any discriminatory actions by him based on plaintiffs' Rehabilitation Act, FHA and ADA claims. *United States v. Incorporated Village* of *Island Park,* 888 F. Supp. 419, 444 (E.D.N.Y. 1995) (citing cases applying respondeat superior to Fair Housing Act); *see also Bonner v. Lewis,* 857 F.2d 559, 566-68 (9th Cir. 1988) (holding that respondeat superior doctrine applies to Section 504 of the Rehabilitation Act); *Patton v. Dumpson,* 498 F. Supp. 993, 942-43 (S.D.N.Y. 1980) (stating doctrine of respondeat superior applies in civil rights statutes generally and Section 504 of the Rehabilitation Act in particular and collecting cases); *Comm'n on Human Rights & Opportunities v. Sullivan*, 285 Conn. 208, 225, 939 A.2d 541, 553 (2008) (*citing Miko v. Comm'n on Human Rights & Opportunities*, 220 Conn. 192, 202, 596 A.2d 396 (1991) (stating that Connecticut courts look to federal case law to interpret state's fair housing statute); *see also* Rec. Doc. 214, 14-15 (stipulation of counsel).

13. Derby is liable under the FHA, the ADA, and Section 504 of the Rehabilitation Act for any intentionally discriminatory zoning actions by its ZBA. *Forest City Daly Housing. Inc. v. Town* of *North Hempstead,* 175 F.3d 144, 151 (2d Cir. 1999); *see also Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 574 (2d Cir. 2003); *Innovative Health Systems Inc. V. City* of *White Plains,* 117 F. 3d 37, 44-46 (2d Cir. 1997) *superseded by rule as stated in Zervos v. Verizon New York, Inc.,*

252 F. 3d 163 (2d Cir. 2001) (ADA and Rehabilitation Act); *Huntington Branch.*
*NAACP v. Town* of *Huntington,* 844 F.2d 926, 936-37 (2d Cir. 1988), *aff'd,* 488
U.S. 15, 109 S.Ct. 276,102 L.Ed.2d 180 (1988)(FHA); *see also AvalonBay*
*Communities, Inc. v. Town of Orange*, 256 Conn. 557, 592, 775 A.2d 284, 307
(2001) (applying Connecticut fair housing statute to zoning decision).
Additionally, the referring United States District Judge, the Honorable Robert N.
Chatigny, in his oral ruling on defendants' motion for summary judgments found
that under FHA, ADA and Rehabilitation Act, Derby is liable for actions of the
ZBA. (*Summ. J. Tr. 26, Rec. Doc. 139*).

14. Claims of intentional discrimination under the FHA, the ADA, and the
Rehabilitation Act are analyzed under the *McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973), burden-shifting analysis established for employment
discrimination cases under Title VII of the Civil Rights Act of 1964. *Reg'l Econ.*
*Cmty. Action Program*, 294 F.3d at 48-49. Under this scheme, the plaintiffs must
first establish a prima facie case of discrimination. *Id.* "To establish a prima facie
case of discrimination under the FHA and the ADA, the plaintiffs must present
evidence that 'animus against the protected group was a significant factor in the
position taken by the municipal decision-makers themselves or by those to whom
the decision-makers were knowingly responsive.'" *Id. at* 49 (quoting *LeBlanc-*
*Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir.1995)).

15. To establish a prima facie case of discrimination under the Rehabilitation Act,
which has a more stringent standard than the FHA and ADA, plaintiffs must show

that defendants' actions were taken "solely" because of protected status of the prospective occupants of the plaintiffs' properties. *Flight v. Gloeckler,* 68 F.3d 61, 64 (2d Cir. 1995).

16. Determining whether plaintiffs can meet their burden of presenting a prima facie case of discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village* of *Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265-66, 97 S.Ct. 555 (1977); *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 579-80 (2d Cir. 2003). In evaluating a claim of discriminatory decision-making, courts must consider the following factors: a) the discriminatory impact of the governmental decision; b) the decision's historical background; c) the specific sequence of events leading up to the challenged decision; d) departures from normal procedural sequences; and e) departures from normal substantive criteria. *Tsombanidis,* 352 F.3d at 579-80.

17. Plaintiffs presented a prima facie case of discrimination based on the *Village of Arlington Heights* factors at trial. The impact of Derby's actions was to prevent plaintiffs' project of providing supportive housing from going forward. The historical background of the Derby's decision, including Garofalo's thwarting of the Mutual Housing project a few years before and the non-renewal of the Spooner House lease (*Findings of Fact paragraphs 49 and 50*), supports a conclusion of discriminatory decision-making. The sequence of events leading to both Kopjanski's denial of CZCs, including Garofalo's visit to CHFA (*Findings of Fact paragraphs 24 and 25*), Kopjanski's tenuous position without a contract (*Findings*

*of Fact paragraphs 27, 28, and 29*) and Garofalo and Kopjanski's contradictory statements about whether they ever spoke about the plaintiffs' project (*Findings of Fact paragraph 30)*, and the ZBA denial of plaintiffs' appeal, including Garofalo's angry phone call to Thomas (*Findings of Fact paragraph 60)*, Rizzitelli's contradictory and unconvincing testimony about the number of times he and Garofalo spoke about the project (*Findings of Fact paragraph 62)* Rizzitelli's refusal to get an opinion from Corporation Counsel (*Findings of Fact paragraph 71)* and Rizzitelli's drafting of the decision to deny plaintiffs' appeal before the meeting without discussion with the other ZBA members and without showing them a draft prior to reading it into the record (*Findings of Fact paragraph 76)* support a conclusion of discriminatory decision-making. The procedural irregularities of the ZBA hearing support a conclusion of discriminatory decision making (*Findings of Fact paragraphs 63, 65, 66, 70, 72, and 75)*. The decision was also a departure from the substantive criteria normally applied as Kopjanski stated that he applied 195-87(E)(1) to plaintiffs, requiring them to seek variances, but did not apply it to other properties in the Caroline Street neighborhood, whether their renovations were greater or less than 50 percent. (*Findings of Fact paragraphs 38 and 85)*.

18. Once a plaintiff presents a prima facie case of discrimination based on the *Village of Arlington Heights* factors, the burden shifts to the defendant to proffer a legitimate, non-discriminatory, reason for its actions. *Reg'l Econ. Cmty. Action Program,* 294 F. 3d at 49. If the defendant does so, the presumption of

discrimination no longer applies, and the sole remaining issue is discrimination *vel non*. *Id.* at 49 (*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). The plaintiff must then prove that the defendant intentionally discriminated against plaintiff on a prohibited ground. *Id.* Where, however, the plaintiff "'make[s] a substantial showing' that the defendant's proffered explanation was false, 'it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the [defendant's] explanation.'" *Id.* (quoting *Reeves*, 530 U.S. at 146-47, 120 S.Ct. 2097).

19. The Court finds that defendants' proffered explanation, that both Kopjanski and the ZBA were merely applying the zoning regulations to the plaintiffs in a non-discriminatory manner, based on the entirety of the record to be unbelievable and, thus, false. The defendants' explanation for their "interpretation" of the Derby zoning regulations, particularly that plaintiffs' were a non-conforming use, that under 195-87(E)(1) renovation can be defined as damage, that the portion of 195-20(H) that allowed density higher than 12 units per acre if plaintiffs showed they had sufficient parking applied to plaintiffs, and that 195-80(c)(3) required plaintiffs to apply for a variance (*Findings of Fact paragraphs* 37, 38, 39, 40, 41, 64) each defy logic and the plain reading of the Derby zoning regulations. Kopjanski's interpretation of the zoning regulations was at times nonsensical, he did not fully read several sections he relied on and the interpretation belied a deliberately obtuse, ever-changing reading of the regulations by someone who knew what outcome Garofalo wanted and the outcome that would assure him

keeping his job. The Court further finds that in voting to uphold Kopjanski's decision, the ZBA members relied on Kopjanski's interpretation of the zoning regulations, as well as Rizzitelli's proposed opinion on plaintiffs' appeal, without having read it beforehand or being afforded the opportunity to probe him on his research, which from the record before the Court none of the ZBA members were inclined to do. Rizzitelli, by refusing to get an opinion from corporation counsel, by using his authority to control the meetings, and by drafting the opinion before the June 16, 2005 meeting without giving the other members of the ZBA a chance to read it ahead of time, acted to prevent plaintiffs' appeal from succeeding. The Court finds that actions of Garofalo, Kopjanski and Rizzitelli, as chairman of the ZBA, and the ZBA itself, for all of whom the City of Derby is liable, had the effect of making unavailable or denying housing to plaintiffs' proposed tenants. The Court finds that discrimination was not only a significant factor in Derby's dealings with and decisions not to grant plaintiffs CZCs but further that discrimination was the sole reason for Derby's actions under the FHA, ADA, the Connecticut Fair Housing Act (Conn. Gen. Stat. § 46a-64c(6)(c)) and the Rehabilitation Act.

### b. Equal Protection Claim

20. As the Court has found for the plaintiffs on their FHA, ADA and Rehabilitation Act claims and because plaintiffs' counsel stipulated at the outset of trial that the case was primarily a statutory case and the §1983 Equal Protection claim afforded the plaintiffs no additional relief (*Trial Tr. vol. 2, 33-37, July 26, 2010, Rec. Doc.*

*214*), the Court does not reach the question of whether defendants violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### c. Reasonable Accommodation

21. As the Court has found the defendants intentionally discriminated against plaintiffs, it does not reach the question of defendants' failure to grant plaintiffs a reasonable accommodation under the FHA, ADA or Rehabilitation Act. *See Reg'l Econ. Cmty. Action Program*, 294 F.3d at 53 *(quoting Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir.1995)).

### d. Failure to mitigate

22. At the close of testimony on May 6, 2011 defendants made an oral motion for judgment on their affirmative defense of failure to mitigate damages and requested five days to brief the issue, which the Court granted (*Rec. Doc. 253*). The parties briefed the issue (*Rec. Docs. 258 and 259*) and on May 16, 2011 the Court issued an order deferring ruling on defendants' motion until it issued its decision on the merits (*Rec. Doc. 262*). Defendants assert that plaintiffs failed to mitigate their damages by failing to request a reasonable accommodation of a waiver of Derby Zoning Regulation Section 195-80(c)(3) and by failing to bring their Fair Housing suit "in a timely manner if plaintiffs truly believed that Derby's zoning ordinance would likely be applied in a discriminatory manner." (*Defs' Mot. for J. 3, Rec. Doc. 257*). Defendants assert that plaintiffs should have requested a reasonable accommodation in May or early June 2004, when HOME Inc. learned that

Kopjanski refused to grant them CZCs, but "elected instead, to mount a lengthy legal battle over the legality of the Derby zoning regulations." *Id.* at 4. The parties stipulated that the plaintiffs did not request a reasonable accommodation until July 2006 and "could have requested one earlier." (*Rec. Doc. 169*). Defendants assert that had plaintiffs requested a reasonable accommodation on or about May 28, 2004, "the case would have taken a much different track": Derby would have been on notice that plaintiffs were seeking a CZC as a reasonable accommodation; Derby would have had an opportunity to respond; and the likely response, placing the request on the agenda of the Zoning Board of Appeals, would have resulted in either the granting of the reasonable accommodation and avoidance of all delay for the plaintiffs, or in its denial, in which case plaintiffs' federal suit would have "ripened" at an earlier date. (*Defs' Mot. for J. 7-8, Rec. Doc. 257*).

23. The Second Circuit has not addressed whether a duty to mitigate applies in Fair Housing cases and the Ninth Circuit has raised at least a question as to whether the duty applies at all. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 824 -825 (9th Cir. 2001) ("Assuming without deciding that Fair Housing plaintiffs such as the partnership have a duty to mitigate damages, that duty requires the plaintiff to do no more than is reasonable to avoid damages."); *see also Miller v. Apartments and Homes of New Jersey, Inc.*, 646 F.2d 101, 112 (3rd Cir. 1981), *abrogation on other grounds recognized by Hoffman v. McNamara*, 688 F. Supp. 830, 831 (D. Conn. 1988). The Court finds, without holding, that, assuming plaintiffs had a duty to mitigate their damages, plaintiffs, at a bare

minimum, did what was reasonable under the circumstances and given the obstacles that they encountered due to the actions of Garofalo, Kopjanski, Rizzitelli and the ZBA, to mitigate their damages, seeking many different avenues to try to convince Derby to issue the CZCs and re-opening one of the buildings for rental.

24. The Second Circuit has held that "[t]o prevail on a reasonable accommodation claim, plaintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question." *Tsombanidis,* 352 F.3d at 578. However, it does not follow from that holding that failure to request a reasonable accommodation at the earliest possible occurrence of discriminatory behavior is a failure make reasonable efforts to mitigate damages. Although Kopjanski testified that if the plaintiffs had raised the issue of a reasonable accommodation with him, "it would not be a zoning matter anymore" (*Kopjanski, Trial Tr., 174-76, April 13, 2011, Rec. Doc. 247*), the Court cannot credit this testimony, because when plaintiffs did seek a reasonable accommodation on July 13, 2006, defendants waited almost six months to respond and when they did, directed plaintiffs to file for a variance before the ZBA. (*Findings of Fact paragraphs 86 and 87).* Further, in order to grant defendants' motion, the Court would have to find that plaintiffs' decision to pursue the appeal process provided by the Derby Zoning Regulations and the statutes of the state of Connecticut in appealing Kopjanski's decision to the Zoning Board of Appeals and then appealing the ZBA's decision to the state court,

where they ultimately prevailed, was unreasonable. This the Court cannot and will not do.

25. Further, the Court finds that plaintiffs actively sought to mitigate their damages. Plaintiffs re-opened 16 Fourth Street to rent it during the pendency of their appeal process (*Damages paragraph 20*). In addition, the plaintiffs prepared an application for financing to proceed only with the Ansonia property, but because the cost per unit was so high, the application "would have been dead on arrival." *(Hill, Trial Tr. 70-71, 78-79, April 20, 2011, Rec. Doc. 254; Plaintiffs' Exhibit 101)*. At the instructions of Derby officials, plaintiffs filed for variances, knowing that they were not required to do so under the Derby zoning regulations and that they knew they were not legally entitled to receive the variances. Plaintiffs, through their attorney, also submitted a zone text change to Kopjanski. (*Findings of Fact paragraph 57*).

## VI. Damages

1. Compensatory damages are available for a violation of the Fair Housing Act under 42 U.S.C. 3613(c)(1), for a violation of the Americans with Disabilities Act under 42 U.S.C. § 12133 and 29 U.S.C. § 794a, and for a violation of Section 594 of the Rehabilitation Act under 29 U.S.C § 794a. United States District Judge Chatigny found that defendant Kopjanski was "basically a nominal party at this point," but declined to dismiss the claims against him only to allow for the possibility that plaintiffs might need to request injunctive relief. (*Summ. J. Tr. 26, Rec. Doc.*

*139*). The plaintiffs are not seeking judgment for personal liability against Kopjanski. (*Summ. J. Tr. 22, Rec. Doc. 139*).

2. Attorneys fees and reimbursement of costs are available for a violation of the Fair Housing Act under 42 U.S.C. § 3613(c)(2), for a violation of the Americans with Disabilities Act under 42 U.S.C. § 12133 and 29 U.S.C. § 794a, and for a violation of Section 594 of the Rehabilitation Act under 29 U.S.C § 794a.

3. Plaintiffs are entitled to offer of judgment interest under Connecticut state law if the total amount of the judgment entered by the Court exceeds the amount of plaintiffs' offer to settle their claim pursuant to Connecticut General Statutes Section 52-192a and District of Connecticut Local Rule of Civil Procedure 68.

4. As a result of defendants' discriminatory denial of the CZCs, the plaintiffs lost promised CHFA financing under the PILOTS program for rehabilitation of the Derby properties and two Ansonia properties, because agency funding was contingent on Derby's granting the CZCs. *(Peterson, Trial Tr., 140-56, July 29, 2010, Rec. Doc. 189; Plaintiffs' Exhibit 101, page 2).*

5. Plaintiffs had to reapply for another round of funding and were not able to obtain a financing commitment until September 7, 2007, in a later round of CHFA funding, Next Steps Round II. (*Hill, Trial Tr., 77-84, 86, April 20, 2011, Rec. Doc. 254; Peterson, Trial Tr., 163-65, July 29, 2010, Rec. Doc. 189, Plaintiffs' Exhibit 61*).

6. As a result of defendants' discriminatory denial of CZCs, plaintiffs were delayed 39 months in moving forward with the CHFA funding process necessary to finance the rehabilitation work needed to open supportive housing units in Derby

and Ansonia, or from June 2004, when Kopjanski denied the CZCs (more precisely on May 25, 2004), through the beginning of September 2007, when plaintiffs, having received their CZCs after the state court entered judgment in favor of plaintiffs, were back in line for a new round of CHFA funding. *(Peterson, Trial Tr., 144-65, July 29, 2010, Rec. Doc. 189; Hill, Trial Tr.,81-85, April 20, 2011, Rec. Doc. 254; Plaintiffs Exhibits 61 and 95).*

7. After receiving notice in September 2007 that CHFA had reserved funds for the project, plaintiffs were required to complete several steps before they could actually close on their loan with CHFA and obtain the promised funds, including: preparation of detailed drawings; considerable negotiation with CHFA about construction details; formal approvals by the CHFA board. Additionally, shortly before the anticipated Fall 2009 closing, the contractor whom CHFA had approved withdrew from the project, requiring that the job be rebid and delaying the closing until late March 2010. (*Migani, Trial Tr., 135, 139-41, April 15, 2011, Rec. Doc. 246; Hill, Trial Tr., 145-54, April 20, 2011, Rec. Doc. 254*).

8. Defendants delayed plaintiffs' closing for 39 months. Absent discrimination, the closing would have occurred not in March 2010 but at least 39 months earlier, by January 2007. At trial plaintiffs presented documents representing damages for two different 39-month damage periods (the first from August 2006 to October 2009 and the second from January 2007 to March 2010) as the trial was originally scheduled to commence February 5, 2010 (*Rec. Doc. 142*) but was upset when the case was transferred to the undersigned on January 21, 2010 (*Rec. Doc. 150*) and

plaintiffs' counsel neglected to update all of their exhibits prior to trial. The Court finds plaintiffs are entitled to damages based on the exhibits representing the updated period, from January 2007 to March 2010, which inures to the defendants' advantage as it represents damages in a lesser amount incurred by plaintiffs than those incurred for the period from August 2006 to October 2009. Although there was some confusion at trial because both damages periods were discussed, the Court finds that plaintiffs proved that the damages for the period from January 2007 to March 2010 were related to the delay caused by the City of Derby's discriminatory conduct, and those damages and all of plaintiffs' damages, were established, by at the very minimum, a preponderance of the evidence. (*Trial Tr., 94-100, April 25, 2010, Rec. Doc. 264; Trial Tr., 8-22, 45-52, April 28, 2010, Rec. Doc. 286; Trial Tr., 16-20, May 2, 2011, Rec. Doc. 278; Trial Tr., 88-91, May 3, 2011, Rec. Doc. 272; Trial Tr., 89-93, May 5, 2011, Rec. Doc. 279; Court Exhibit 3*).

### a. Valley Housing/ Home Development Inc. Damages

9. Plaintiffs calculated the increase of construction cost of $143,003 based on the amount of the increase from the highest estimate that the plaintiffs received in 2006, months prior to the January 2007 date when they would have been able to close ($2,872,298 from Merit Construction, *Plaintiffs' Exhibits 64 and 65*), to the lowest bid that plaintiffs received that was on the table in March 2010 when they were actually able to close ($3,015,301 from LaRosa Construction). *(Hill, Trial Tr., 106-110, 114-23, April 25, 2011, Rec. Doc. 264, Trial Tr., 168, April 27,*

2010, Rec. Doc. 282 *("I believe that Merit and LaRousa [sic] used materially similar procedures to come up with their number, and I believe them to be correct in that there was a price change – a cost change between those two time frames, and I believe it to be that the fact that there is a time frame to be on account of actions of the City of Derby."); Plaintiffs' Exhibits 64 and 65.*)  Architect Migani testified that changes to the Fire Safety Code and Building Code would have increased construction costs. *(Migani, Trial Tr., 54-58, April 18, 2011, Rec. Doc. 255).*  Migani also testified that the buildings were in "significantly worse condition" when reconstruction finally began than when he first saw them, in part because of delays because the buildings "sat vacant and unheated and largely unoccupied." *(Migani, Trial Tr., 149, 182-83, 203, April 18, 2011, Rec. Doc. 255).*  Hill testified similarly that code changes and building deterioration changed the scope of the reconstruction and that a change in bedroom count had a small, if any, change in the cost of construction. *(Hill, Trial Tr., 161-64, April 27, 2010, Rec. Doc. 282).*

10. The 2010 bid, from LaRosa Construction, is lower by approximately $800,000 than the bid that the plaintiffs had anticipated having to have to use (from a third contractor, Marconi Construction, Merit having dropped out). Plaintiffs have given the defendants credit for these entire savings, so plaintiffs' efforts to obtain the best price have resulted in a reduction in plaintiffs' claimed damages by the same approximately $800,000. *(Hill, Trial Tr., 154-60, April 20, 2011, Rec. Doc. 254; Plaintiffs' Exhibit 89).*

11. Additionally, the 2010 bid is lower by $292,950 because it does not include any of the additions and allowances that were added to the 2010 bid, with the approval of CHFA, and included in the final contract price. (*Hill, Trial Tr., 154-60, April 20, 2011, Rec. Doc. 254*, *Trial Tr., 104-06, 117-20, April 25, 2011, Rec. Doc. 264*; *Plaintiffs' Exhibit 90*). Plaintiffs have not claimed the cost of any of these additions and allowances as damages, again resulting in a reduction of claimed damages by plaintiffs against defendants by $292,950.

12. The Court credits Hill's testimony that he signed the Marconi building permits before the amounts were filled in and so was not involved in setting the amounts on the building permits, which were lower than Marconi's construction contract price, as he believed the contractor and Kopjanski would negotiate which expenses applied to which permits and which might be excludable entirely. In addition, the Court notes the building permits were not actually used, and the lower numbers on the building permits in no way affects the Court's view of Hill's credibility. (*Hill, Trial Tr., 133-42, 154-178, April 25, 2011, Rec. Doc. 264; Trial Tr., 29-32, April 26, 2011, Rec. Doc. 265*; *Trial Tr., 96-104, April 28, 2011, Rec. Doc. 286*).

13. Damages also include an increase in the construction contingency due to the delay of $17,446. The contingency represents an allowance, reviewed and approved by CHFA, for work whose need becomes evident only during the construction process. The contingency for this project is 12.2 percent of the contract price, and is therefore 12.2 percent of the increase in the increased construction costs (*Damages paragraph 12*). (*Hill, Trial Tr., 124-31, April 25, 2011, Rec. Doc. 264*,

*Trial Tr., 169-70, April 27, 2010, Rec. Doc. 282*). Hill testified that most of the construction contingency would likely be expended. (*Hill, Trial Tr., 126, April 25, 2011, Rec. Doc. 264*).

14. Plaintiffs Valley Housing/Home Development Inc. were required to spend $8,000 on an otherwise-unnecessary additional land survey on account of the delay. (*Hill, Trial Tr., 146-50, April 25, 2011, Rec. Doc. 264; Trial Tr., 84-85, April 28, 2011, Rec. Doc. 286; Plaintiffs' Exhibit 79*).

15. The 39 months of delay caused Valley Housing/Home Development Inc. to pay $218,000.41 in additional bridge loan interest between January 2007 and March 2010. (*Hill, Trial Tr., 21-38, April 21, 2011, Rec. Doc. 273, Trial Tr., 172-87, April 27, 2010, Rec. Doc. 282 (discussing Plaintiffs' Exhibit 76, however, the Court finds that the same analysis applies to Plaintiffs' Exhibit 117, which shows bridge loan interest for the correct damage period, see Trial Tr., 176, May 5, 2011, Rec. Doc. 279); Plaintiffs' Exhibit 117*).

16. The delay caused Valley Housing/Home Development Inc. to pay $13,220 in additional bridge loan fees. (*Hill, Trial Tr., 38-40, April 21, 2011, Rec. Doc. 273 (discussing Plaintiffs' Exhibit 75, however, the Court finds that the same analysis applies to Plaintiffs' Exhibit 116, which shows bridge loan interest for the correct damage period, see Trial Tr., 176, May 5, 2011, Rec. Doc. 279), Plaintiffs' Exhibit 116*).

17. Defendants' discriminatory refusal to grant CZCs caused Valley Housing/Home Development Inc. to pay $43,682 for otherwise unnecessary legal services related

to zoning compliance. Plaintiffs incurred legal expenses when they submitted their Affordable Housing application, which they later withdrew; the Court credits Hill's testimony that the plaintiffs were seeking any avenue available to them to try to continue with their project after Derby's discriminatory acts derailed their project. *(Hill, Trial Tr., 141-45, April 21, 2011, Rec. Doc. 273; Plaintiffs' Exhibit 74).*

18. The 39 months of delay caused Valley Housing/Home Development Inc. to pay $12,500 for an otherwise-unnecessary updated appraisal for underwriting purposes because the prior appraisal was stale by the time plaintiffs got back in line for CHFA funding. *(Hill, Trial Tr., 41-42, April 21, 2011, Rec. Doc. 273; Plaintiffs' Exhibit 73).*

19. The 39 months of delay caused Valley Housing/Home Development Inc. to spend $222,656.35 in additional net holding costs between January 2007 and March 2010 it would not otherwise have had to pay and/or would have been offset by income from rent. Those holding costs included utilities, taxes, gas, water, and maintenance fees, reduced by rental receipts actually received when apartments were re-opened. (*Damages paragraph 20; Hill, Trial Tr., 75-99, 103-08, April 21, 2011, Rec. Doc. 273, Trial Tr., 9-16, April 25, 2011, Rec. Doc. 264, Trial Tr., 80-84, April 28, 2011, Rec. Doc. 286 (discussing Plaintiffs' Exhibit 72, however, the Court finds that the analysis applies to Plaintiffs' Exhibit 115, see Trial Tr., 176, May 5, 2011, Rec. Doc. 279*); *Plaintiffs' Exhibit 115*).

20. Plaintiffs mitigated their damages by re-renting 16 Fourth Street, and credited defendants with $71,632.22 in income from re-rental. *(Hill, Trial Tr., 118- 21, April 21, 2011, Rec. Doc. 273; Plaintiffs' Exhibit 111)*. However, the re-rental basically broke even as plaintiffs Valley Housing/Home Development Inc. had to pay $70,380.10 in otherwise-unnecessary costs to re-open apartments at 16 Fourth Street. Those costs included construction, utility set-up, and repairs, as well as dumpster rental that was originally included in Plaintiffs' Exhibit 72 ($70.69). *(Hill, Trial Tr., 111-118, April 21, 2011, Rec. Doc. 273, Trial Tr.,13-14, 25-26, April 25, 2011, Rec. Doc. 264; Plaintiffs' Exhibit 71)*. Plaintiffs' damages are reduced by the net income they received from the re-rental, so the total credit to defendants is $1,252.12. (*Hill, Trial Tr., 117-22, April 21, 2011, Rec. Doc. 273, Plaintiffs' Exhibit 111*).

Plaintiffs Valley Housing/Home Development Inc.'s damages are itemized as set out below:

| Category | Amount | Plaintiffs' Exhibit |
|----------|--------|---------------------|
| **Increased Construction Costs** | **$143,003** | **72** |
| **Increased Construction Contingency** | **$17,446** | **92** |
| **Additional Land Survey** | **$8,000** | **79** |
| **Additional bridge loan interest** | **$219,000.41** | **117** |
| **Additional bridge loan fees** | **$11,234.91** | **116** |
| **Legal Services** | **$43,682.10** | **74** |

| Updated Appraisal | $12,500 | 73 |
|---|---|---|
| Net Holding Costs | $222,656.35 | 115 |
| Costs to re-open 16 Fourth Street | $70,380.10 | 71 |
| Income from 16 Fourth Street Rental | ($71,632.22) | 111 |
| | | |
| Total: | $676,279.65 | |

### b. Home Inc.'s Damages

21. Defendants' discriminatory refusal to grant CZCs cost Home Inc. $42,545.35 in the cost of staff time devoted to addressing and undoing Derby's discrimination, including such matters as involvement in the zoning hearings, fruitless negotiations with the City and interacting with multiple bidders over multiple time periods in an effort to keep the project afloat during the delay. *(Hill, Trial Tr., 41-51, April 25, 2011, Rec. Doc. 264, Trial Tr., 128-33, April 28, 2011, Rec. Doc. 286; Peterson, Trial Tr., 18-46, May 6, 2011, Rec. Doc. 280; Plaintiffs' Exhibit 94*). The United States Supreme Court has recognized impairment of a nonprofit plaintiff's mission as an injury for standing purposes. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 1124 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." (citing *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct.1361, 1368 (1972))). District courts have found that evidence

similar to that presented by plaintiffs, i.e., "based on the employees' salary, fringe benefits, and a portion of office overhead" is an appropriate measure of damages for diversion of resources. *Saunders v. General Services Corp.*, 659 F. Supp. 1042, 1060 (E.D. Va. 1986). The Second Circuit affirmed a damage award including diversion of resources damages. *Tsombanidis*, 352 F.3d at 580-81. The district court in *Tsombanidis* awarded damages for hours spent by the plaintiff organization's Chief Executive Officer, finding that the plaintiff had "adequately segregated time spent on this specific matter from other matters" and "that the number of hours claimed by [the organization] for his work over a four-year period is reasonable and necessary." *Tsombanidis v. City of West Haven*, 180 F. Supp. 2d 262, 295-96 (D. Conn. 2001). Here the Court finds that the number of hours spent by Hill and Peterson were adequately reconstructed, albeit after the fact, based on documents, emails and their calendars to calculate time spent only on the plaintiffs' project; that the time they spent combating Derby's discriminatory acts was time they were not spending on other projects that would further Home Inc.'s mission; that in making their calculations Hill and Peterson gave every benefit of the doubt to defendants; and, that the hours claimed for each are more than reasonable and were necessary.

22. Although plaintiffs claimed damages for time spent in trial by Hill in the amount of $8,414.13 and Peterson in the amount $908.32 in their post-trial proposed finds of fact (*Rec. Doc. 289, paragraphs 255-56*), the Court finds that in no event are plaintiffs entitled to time spent by Peterson in trial and that there was not sufficient

detail in the record to find time spent by Hill in trial by a preponderance of the evidence.

23. Plaintiffs credit the defendants $19,200 in management fees received by HOME Inc. for managing the properties while they were vacant (or, in some cases, rented) during the 39-month delay.  (*Hill, Trial Tr., 108-111, April 21, 2011, Rec. Doc. 273*; *Trial Tr., 14-16, April 25, 2011, Rec. Doc. 264 (discussing Plaintiffs' Exhibit 72, however, the Court finds that the analysis applies to Plaintiffs' Exhibit 115*); *Plaintiffs' Exhibit 115*)**.**

24. Plaintiffs assert the 39 months of delay caused HOME Inc. to lose $8,571 in otherwise-expected management fees for managing the properties once they were completed and rented. *(Hill, Trial Tr., 123-41, April 21, 2011, Rec. Doc. 273; Trial Tr., 63-71, 77-85, 88-90, April 25, 2011, Rec. Doc. 264; Trial Tr.,6-19, April 27, 2010, Rec. Doc. 282).*  Hill admitted under cross examination that the delay in receiving the management fees resulted in a savings to Home Development Inc., which deferred paying management fees by 39 months, so will pay the fees with cheaper dollars in the future. *(Hill, Trial Tr.,61-91, April 27, 2010, Rec. Doc. 282; Trial Tr., 4-5, April 28, 2011, Rec. Doc. 286; Plaintiffs' Exhibit 78).*  Although the Court credits Hill's testimony that the savings to Home Development Inc. from not having to pay management fees was a result of the buildings standing empty and, thus, Home Development Inc. lost rental income, Home Development Inc. did not claim lost rent as an element of damages *(Hill, Trial Tr., 122-25, April 28,*

*2011, Rec. Doc. 286*) and the Court finds HOME Inc. did not prove its claim for lost management fees by a preponderance of the evidence.

25. The 39 months of delay caused Home Inc. to pay $50,833.43 in borrowing costs due to the delay of receipt of the development fee. Hill testified that Home Inc.'s policy was to pay the interest on time, but because of the strain on Home Inc.'s finances caused from the delay caused by Derby's discriminatory conduct, it incurred late fees and additional interest on its lines of credit. *(Hill, Trial Tr., 66-72, April 21, 2011, Rec. Doc. 273, Trial Tr., 52-72, 77, 126-27, April 28, 2011, Rec. Doc. 286 (discussing Plaintiffs' Exhibit 69, however, the Court finds that the same analysis applies to Plaintiffs' Exhibit 114); Plaintiffs' Exhibit 114).*

Plaintiff HOME Inc.'s damages are itemized as set out below:

| Category | Amount | Plaintiffs' Exhibit |
|---|---|---|
| Staff time | $42,135.35 | 94 |
| Credit for management fees | ($19,200.00) | 115 |
| Borrowing costs | $50,833.43 | 114 |
|  |  |  |
| Total | $73,768.78 |  |

## VII.   Conclusion

For the foregoing reasons the Court will enter judgment in favor of plaintiffs, Valley Housing Limited Partnership, Home Development Inc. and HOME Inc., and

against defendants City of Derby and David Kopjanski, Zoning Enforcement Official and Building Official in his official capacity, on Count 1 (Fair Housing Act), Count 3 (ADA), Count 4 (Section 504 of the Rehabilitation Act) and Count 5 (Connecticut's Fair Housing Act) in the following amounts: $676,279.65 in favor of plaintiffs Valley Housing/Home Development Inc. and $73,768.78 in favor of plaintiff HOME Inc. Plaintiffs are entitled to an award of reasonable attorneys' fees and costs under the FHA under 42 U.S.C. 3613(c)(2), the ADA under 42 U.S.C. § 12133 and 29 U.S.C. § 794a, and the Rehabilitation Act under 29 U.S.C § 794a, and offer of judgment interest under Connecticut law if the total amount of the judgment(s) that the Court will enter as set out above exceeds the amount of plaintiffs' offer under Conn. Gen. Stats. Section 52-192a and District of Connecticut Local Rule of Civil Procedure 68.

Bridgeport, Connecticut this 29th day of July 2011.

Tucker L. Melançon
United States District Judge